******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* NATHAN S.*
## (AC 46561)

Suarez, Seeley and Wilson, Js.

*Syllabus*

Convicted, after a jury trial, of sexual assault in the fourth degree and risk of injury to a child in connection with the sexual abuse of an eleven year old girl, A, the defendant appealed to this court. He claimed, inter alia, that the trial court improperly admitted testimony from his teenage son, U, regarding statements he made to U about middle school age girls, pursuant to the Connecticut Code of Evidence (§ 4-5 (b)) as evidence of his propensity to engage in aberrant and compulsive sexual misconduct and pursuant to the Connecticut Code of Evidence (§ 4-5 (c)), as evidence of his specific intent to obtain sexual gratification for purposes of the charge of sexual assault in the fourth degree. *Held*:

This court had a fair assurance that the trial court's admission of U's testimony regarding the defendant's comments about middle school age girls did not substantially affect the jury's verdict, as this court concluded that, even if it assumed there was error in the trial court's ruling, in light of the relative strength of the state's case, the defendant failed to establish that he was harmed by the admission of U's testimony, which encompassed only about ten pages of the 1400 pages of transcript and had at best a minimal impact on the jury.

The prosecutor's cross-examination of the defendant's DNA expert, M, with respect to her conclusion that the defendant was eliminated as a contributor to DNA samples taken from an item of A's clothing, namely, leggings, was not improper, as the prosecutor's questioning of M intended to make the point that exclusion as a possible contributor did not necessarily mean that the defendant had never touched the leggings, it was not improper for the prosecutor to question M about how the data in an exhibit that previously had been admitted into evidence but which the state then marked up with highlighting, formed the basis for M's conclusion, and the prosecutor's use of the term "profile" rather than "type" when questioning M about the DNA

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024); we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

samples did not amount to impropriety when viewed in the context of the entire trial, in which M utilized the correct terminology in her answers to the prosecutor's questions.

The defendant could not prevail on his unpreserved claim that the trial court violated his constitutional right to a unanimous verdict by failing to give the jury a proper specific unanimity instruction with respect to the charge of sexual assault in the fourth degree because, although the trial court instructed the jury that it was required to be unanimous as to which of the three ways the defendant was alleged to have committed sexual assault in the fourth degree, it did not instruct the jury, in accordance with the test set forth in *State* v. *Douglas C.* (345 Conn. 421), that it had to be unanimous as to which instance or instances of conduct, if any, it found the defendant to have committed, any risk of prejudice or likelihood that the jury could have disagreed or been confused about the multiple, separate instances of sexual contact was minimized by the defendant's theory of defense, under which the jurors were required either to find that A's allegations were fabricated and that no sexual contact had occurred at all, or to believe A's testimony that the sexual conduct did in fact occur.

(*One judge concurring separately*)

Argued March 20—officially released December 23, 2025

*Procedural History*

Substitute information charging the defendant with two counts of the crime of risk of injury to a child and with one count of the crime of sexual assault in the fourth degree, brought to the Superior Court in the judicial district of Danbury and tried to the jury before *Pavia, J.*; thereafter, the court denied the defendant's motion for a mistrial; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*John R. Weikart*, with whom was *James P. Sexton*, for the appellant (defendant).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom were *Mary-Caitlin Harding*, assistant state's attorney, and, on the brief, *David Applegate*, state's attorney, *Brett R. Aiello*, assistant state's attorney, and *Stephen J. Sedensky III*, special assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Nathan S., appeals from the judgment of conviction, rendered following a jury trial, of the crimes of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A),[1] risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and risk of injury to a child in violation of § 53-21 (a) (1). On appeal, the defendant claims that (1) the trial court improperly admitted certain testimony from his son, U, regarding statements made to U by the defendant concerning the physical appearances of U's middle school female classmates (a) pursuant to § 4-5 (b) of the Connecticut Code of Evidence[2]

---

[1] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when: (1) Such person subjects another person to sexual contact who is (A) under thirteen years of age and the actor is more than two years older than such other person . . . ."

Although § 53a-73a (a) has been amended by the legislature since the events underlying this case; see Public Acts 2023, No. 23-149, § 3; Public Acts 2023, No. 23-47, § 10; Public Acts 2019, No. 19-93, § 10; Public Acts 2019, No. 19-16, § 16; those amendments have no bearing on the merits of this appeal. We, therefore, refer to the current revision of the statute in this opinion.

General Statutes § 53a-65 (3) (A) defines "sexual contact" in relevant part as "any contact with the intimate parts of a person for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person . . . ."

Although § 53a-65 (3) has been amended by the legislature since the events underlying this case; see Public Acts 2023, No. 23-47, § 9; Public Acts 2019, No. 19-189, § 21; those amendments have no bearing on the merits of this appeal. We, therefore, refer to the current revision of the statute in this opinion.

We also note that, although " '[i]ntimate parts' means the genital area or any substance emitted therefrom, groin, anus or any substance emitted therefrom, inner thighs, buttocks or breasts"; General Statutes § 53a-65 (8); in this case, count one of the operative substitute information, which charged the defendant with sexual assault in the fourth degree, alleges only that the defendant had sexual contact with A's breasts and buttocks, and by having A touch his penis, and the trial court instructed the jury accordingly.

[2] Section 4-5 of the Connecticut Code of Evidence provides: "(a) General rule. Evidence of other crimes, wrongs or acts of a person is inadmissible

as evidence of other sexual misconduct by the defendant to establish that he had a propensity to engage in aberrant and compulsive sexual misconduct, and (b) pursuant to § 4-5 (c) of the Connecticut Code of Evidence[3] as evidence of the defendant's specific intent to obtain sexual gratification for purposes of the charge of sexual assault in the fourth degree, and that he was harmed by the erroneous admission of that testimony, (2) the prosecutor engaged in impropriety during cross-examination of an expert witness for the defense by suggesting to the jury, without a scientific or evidentiary basis, that it could conduct its own review of certain DNA evidence to determine whether it matched the defendant's DNA profile, even though the uncontradicted scientific expert testimony established that the defendant was excluded as a possible contributor to the DNA evidence, and (3) the trial court violated his constitutional right to a unanimous verdict with respect

to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b).

"(b) When evidence of other sexual misconduct is admissible to prove propensity. Evidence of other sexual misconduct is admissible in a criminal case to establish that the defendant had a tendency or a propensity to engage in aberrant and compulsive sexual misconduct if: (1) the case involves aberrant and compulsive sexual misconduct; (2) the trial court finds that the evidence is relevant to a charged offense in that the other sexual misconduct is not too remote in time, was allegedly committed upon a person similar to the alleged victim, and was otherwise similar in nature and circumstances to the aberrant and compulsive sexual misconduct at issue in the case; and (3) the trial court finds that the probative value of the evidence outweighs its prejudicial effect.

"(c) When evidence of other crimes, wrongs or acts is admissible. Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony.

"(d) Specific instances of conduct when character in issue. In cases in which character or a trait of character of a person in relation to a charge, claim or defense is in issue, proof shall be made by evidence of specific instances of the person's conduct."

[3] See footnote 2 of this opinion.

to the charge of sexual assault in the fourth degree by failing to give a proper specific unanimity instruction to the jury. We disagree and affirm the judgment of the court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following relevant facts. Between August, 2018, and February, 2019, the victim, A, was eleven years old and the defendant was forty-two years old. A met the defendant through her mother, who worked with the defendant's former wife. A's mother had socialized with the defendant and his former wife, and A's mother continued to socialize with the defendant after his wife left him in 2017. For example, A and her mother would work out with the defendant and eat dinner at his house, and they would play video games with him on Saturdays. During the summer of 2018, A's mother worked four nights per week at a restaurant. Initially, when A's mother was at work, A would be at home with her brother, but in June, 2018, the defendant started watching A at his home one to two times per week, sometimes up to three times. While A was at the defendant's house, they would make dinner and watch movies together, and sometimes the defendant would help A with her homework. Although U[4] was present at times, most of the time the defendant and A were in the home alone. The defendant called A "kiddo" and bought her gifts from time to time. A testified that she had a crush on the defendant at that time.

During the summer of 2018 until February, 2019, A and the defendant communicated with each other primarily via text message, and those communications occurred on a daily basis. In many of his text messages to A, the defendant would tell A that she was "one of [his] best friends." He also prefaced a number of texts by saying, "not to be creepy," or by asking A not to

---

[4] Between August, 2018, and February, 2019, U was fourteen years old.

take something "in a creepy way." For example, the defendant texted A, asking her not to "take this in a creepy way," but he was bored and wanted "to hang out with [her]." He also texted her, writing, "can I say something weird . . . I'm kind of looking forward to having you over for dinner tomorrow"; "happy we get to hang out tomorrow, though . . . not to be creepy"; "want to hear something creepy," after which he told A that he was in her room the prior day; "not to be super creepy but too bad you and I couldn't have just hung out"; "can I say something kind of creepy . . . kind of sort of miss you for dinner tonight"; and, "I like talking to you if that matters . . . and not too creepy." In one text, the defendant wrote, "I could be totally cool talking to you all night but it would be kind of weird for you though I know, right?" In another text, he asks A, "which picture of you and me do you have hanging," and, after A responded by sending a photograph, he replied, "can I be creepy . . . one of my favorite pictures." The defendant also would ask A multiple times by text if she still wanted to "hang out" with him or say that he wanted to hang out with her. They texted each other good morning and good night, and throughout the day. When A talked with U, the defendant would become jealous and stop talking to A. Also, when A did not text him one day, the defendant texted, "wow . . . no text from you today." The defendant also would make A feel bad for spending time with her friends or doing things with other people and not spending time with him. One time, after the defendant expressed concern that A would be too tired "to hang out" with him, A told him to "shut up," and he replied, "spicy this morning . . . I like it." Another time, the defendant asked A to send him a photograph of a drawing she had made, and when she did, he said that he liked it. A stated, "[y]ou want it . . . [y]ou can have it," to which the defendant replied, "[y]ou or the picture? Lol."

When the defendant started watching A at his house, he often would make her dinner, and they would watch a movie in his basement. The defendant, at times, would give A alcohol to drink. Initially, when they watched a movie, the defendant would wrap his arms around A and cuddle with her for an entire movie. Sometimes A would be on top of the defendant, and he would have his arms around her back or on her "butt."

Beginning in August, 2018, and continuing to February, 2019, the defendant's behavior escalated in that he kissed A and started touching her breasts over her clothes. A recalled that the first time she went into the defendant's bedroom was in early August, maybe August 2 or 3, 2018. A went into the defendant's bedroom to retrieve his phone charger, and he followed her into the bedroom and dimmed the lights. They were at the foot of the bed, in the middle, with A sitting on the bed, when the defendant got on top of A and started moving his hips back and forth, pushing his penis against A's vagina. At the time, they were both wearing clothes. The defendant also touched A's breasts over her clothes. A testified that this would happen almost every time that she went to the defendant's house and that each time they were in the defendant's bedroom he would dim the lights. According to A, "[i]t was sort of a routine because [the defendant] would always leave his phone charger in the bedroom and [she would] have to go get it." A also testified that there was one occasion when, while U was in the house, she was in the defendant's bedroom.

Starting in September, 2018, A and the defendant would watch movies in his living room instead of in the basement, during which time the defendant would cuddle or "spoon" with A and touch her thighs, vagina and breasts. When they would be cuddling, either A would be on top of the defendant or vice versa, and he would move his hips back and forth, with his penis

over A's vagina. One of those times, he got up quickly and ran to the bathroom, and A felt wetness on her pants.

A testified about an instance when she touched the defendant's penis. It occurred around the time of Halloween, as there were Halloween decorations in his kitchen, including orange and purple lights, and A remembered "being on top of [the defendant] . . . sitting up and looking and his penis was out, and [she] remember[ed] looking behind [her] and seeing the . . . Halloween lights." This occurred on the couch in his living room. A explained that she first began to touch the defendant's penis "over [his] clothes and then, once [she] started to become more comfortable, it began to happen underneath the clothes." A testified that the defendant "would put [her] hand there and make [her] move [her] hand up and down on it. And, once that would get more comfortable, [she] would have . . . half of [her] hand over . . . the clothes and the other half would be inside the pocket." The defendant "would wear loose pajama pants," including "Grinch" pajama pants, and "he wouldn't have underwear underneath [to make] his penis more accessible." A testified that that the defendant would make her touch his penis "every time" she went to his house.

In the living room, the defendant would touch A's breasts and "butt" over her clothes, and there were times when the defendant would touch A's breasts under her clothes but over her bra, and when he would touch her vaginal area under her clothes but over her underwear and move his hand back and forth. In particular, A testified that, "toward the end of November, beginning of December, [she] went over to [the defendant's] house to watch 'How the Grinch Stole Christmas.' And as [they] were watching it, [the defendant] stuck his hand . . . in [her] pants over [her] underwear and began to move his . . . hand back and forth, on

[her] vagina. . . . When he was done, he looked at [A] and said, 'good girl,' " and A "burrowed [her] head into his shoulder." On November 29, 2018, the defendant texted A and said, "thanks for having spaghetti and meatballs and watching the Grinch with me."

One time in November, 2018, when the defendant was doing laundry, he paused and started hugging A, after which he walked her into another room, said something about "being in his creepy basement" alone, sat down on a beanbag chair and A sat on top of him, and then he gave A a long kiss on the lips. Another time when they were in the defendant's kitchen and dining area, the defendant was standing with his back against the counter with his legs spread a bit, with A standing against him, and he began to rub against her, grabbing her hips, and pushing her into him, saying that she "[drove him] nuts."[5] According to A, the defendant "would hug [her] all the time from behind and from the front," and he was "touchy." A also testified that, at times, after an instance of sexual contact, she would begin shaking and the defendant would feel bad and tell her to go sit with his dog. This occurred one time right after they had left the defendant's bedroom. A further testified that there was one time when they were in the defendant's attic because he had to retrieve something there, and he sat on a top stair while A was "standing on one of the stairs facing toward him . . . [a]nd . . . he proceeded to hit [A's] ass and then tell [her] . . . to get [her] cute ass downstairs." A testified at trial that, on one occasion, after the defendant's dog had humped her leg, she stated that the dog had "raped" her, and the defendant looked at A and said that the dog was "lucky."

---

[5] When asked at trial if the defendant ever expressed to A that he was worried she might say something about their encounters, A testified that the defendant "would say things . . . like you're gonna see me through plate glass one day, I'm never gonna see my son again. You're gonna tell."

In late November, 2018, during the period of time in which the sexual abuse was ongoing, A confided in her best friend, L, about what was happening with the defendant. At that time, A did not tell anyone else because she did not want the defendant to get into trouble or for U to be affected, and she was embarrassed and did not want to accept what was happening to her. Later, however, A did tell her stepsister, who, along with L, encouraged A to tell her mother. Specifically, in February, 2019, A told her mother that the defendant was touching her and that she did not want to go to his house anymore. That was all that A disclosed at that time.[6] In late March or early April, 2019, A told her aunt, K,[7] about the sexual abuse, after which K and A's grandmother called the police and reported the sexual abuse. After A told her mother, A did not go back to the defendant's house again or communicate with him.

After the sexual abuse was reported to the police, Detective Jonathan K. McClintock of the Bethel Police Department was assigned to A's case. He filed a report of suspected abuse with the Department of Children and Families and made arrangements for A to have a forensic interview with Lynn Nichols, a forensic interviewer and the Director of Victim Services for the Women's Center of Greater Danbury. Nichols conducted the forensic interview of A on April 10, 2019.[8] During their

---

[6] At trial, A's mother testified that she did not call the police after speaking with A because she "needed more information," was trying to let A "understand the severity of her accusations," and did not want the defendant to get into trouble for something that she was not sure had happened.

[7] K testified that she was very close with A, who spent many weekends at K's house. K described A's demeanor during her visits as "very happy go lucky." In early April, 2019, or just prior to that time, K had noticed some changes in A's behavior and was concerned because A "was just not herself at all." Specifically, A had been "mopey" and had become "very . . . introverted" and seemed "sad and depressed . . . ."

[8] During the forensic interview, A indicated that the defendant had forced her to drink alcohol. She also indicated that she had kicked the defendant and told him "no" when he made the sexual advances. At trial, however, A testified that the defendant never forced her to drink alcohol and that she

investigation of A's case, the police obtained statements from A; A's friend, L; A's aunt, K; and U. A provided her cell phone to the police. Subsequently, a cell phone forensic examiner conducted a forensic examination of the phone. That examination yielded 893 pages of text messages between A and the defendant between November, 2018, and February 19, 2019.[9] In June, 2019, A provided the police with the leggings she had been wearing during the incident in which she felt wetness on her pants after the defendant had been rubbing his penis against her. A had found the leggings stuffed under a bed at her father's house. Between the winter of 2018, when that incident occurred, and June, 2019, A had worn the leggings frequently and may have washed them. Nevertheless, McClintock submitted the leggings to the state forensic laboratory for DNA testing.

In July, 2019, the defendant was arrested pursuant to a warrant, after which the police obtained a buccal swab[10] from the defendant and executed a search of his residence pursuant to a warrant. He subsequently was charged in a substitute information with sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A) for subjecting A, who was under thirteen years of age, to sexual contact with the defendant, who was more than two years older than A, by touching A's breasts and buttocks and by having A touch his penis; risk of injury to a child in violation of § 53-21 (a) (2)

---

never fought off his sexual advances or told him no, explaining that, at the time, she was very young and thought that she would get into trouble for willingly drinking the alcohol, and that she did not understand that what had occurred could constitute sexual assault in the absence of evidence that she had either said no or fought off the defendant's advances.

[9] A testified at trial that she started texting with the defendant in August, 2018. At the end of October, however, she lost her cell phone and got a new one in the beginning of November.

[10] "A buccal swab involves rubbing a Q-tip like instrument along the inside of the cheek to collect epithelial cells." *State* v. *Walker*, 332 Conn. 678, 683 n.2, 212 A.3d 1244 (2019).

for having subjected "a child under sixteen years of age to contact with his intimate parts in a sexual and indecent manner likely to impair the health and morals of such child"; and risk of injury to a child in violation of § 53-21 (a) (1) for having caused and permitted "a child under the age of sixteen to be placed in a situation that the morals of such child were likely to be impaired . . . ." Over the course of seven days, the case was tried to a jury.

In support of its case, the state presented testimony from Nichols, along with a transcript and a video recording of her forensic interview of A, which were admitted into evidence.[11] McClintock testified regarding his investigation of the allegations against the defendant. The state also presented testimony from A and A's mother, as well as from U (the defendant's son), L (A's friend), and K (A's aunt). In addition, the state presented testimony from Lisa S. Murphy-Cipolla, a licensed marriage and family therapist who also conducts forensic interviews, has more than twenty years of experience working with sexually abused children, and oversees the day-to-day operations of the Greater Hartford Family Advocacy Center, which provides "comprehensive services for the evaluation, treatment and prevention of abuse, primarily child sexual abuse . . . ." During her testimony, the video recording of A's forensic interview was played before the jury, and Murphy-Cipolla, who had never met A, was asked various questions regarding A's forensic interview.

In particular, Murphy-Cipolla testified regarding the forensic interview process and delayed disclosure of child sexual abuse, including the factors that lead to

---

[11] In the forensic interview, A described another incident that occurred one of the last times she was at the defendant's home, which would have been in February, 2019. She described the defendant as being "extra, extra creepy," and stated that he made her touch his penis on the couch and grabbed her "butt" and breasts.

delayed disclosure such as the age of the child victim, the relationship of the abuser to the child, family dynamics, shame and embarrassment. She also explained the five stages of grooming,[12] namely, looking for a vulnerable child, isolating and gaining access to the child, developing trust with the child, trying to initiate or to break boundaries sexually or physically, and maintaining the secret. She explained that "abusers . . . try to . . . ingratiate themselves to the family that they're someone to be trusted and they can help out with something." According to Murphy-Cipolla, "some children do protect their abusers." She also testified, after viewing the video recording in court, that she had "observed some of the stages of grooming that [she] talked about earlier," including that, "when a person grooms a child they also befriend the family," and that, on the basis of her experience, "there were elements of the interview that supported [A's] disclosure," although she did not elaborate further. Moreover, she addressed the dynamics of a relationship between an abuser and a child, explaining that "it's a very complicated, complex relationship that's kind of like bounded by secrecy and silence. [The child] . . . might love the person but want the abuse to stop. [The child] may be getting other things, like, say a secondary gain, like attention or gifts or trips or, you know, [the abuser] might be filling like an emotional role in that child's life or a void." In addition to the 893 pages of text messages between the defendant and A, the state also submitted into evidence, inter alia, diagram sketches of the defendant's house along with various photographs of A and the interior of the defendant's house.

After the prosecutor rested the state's case-in-chief, the defense presented testimony from a number of witnesses, including McClintock and his supervisor, Lieu-

---

[12] After Murphy-Cipolla testified regarding grooming, defense counsel requested that the court provide the jury with a limiting instruction as to grooming, and one was provided to the jury.

tenant George J. Bryce, Jr., concerning the investigation conducted by the police. Kristen Madel, a forensic science examiner employed at the state forensic laboratory, who performed DNA testing on samples taken from A's leggings, testified regarding the results of her testing, and the two reports that she had prepared in connection therewith were admitted into evidence, along with an allele table[13] of the samples taken from the leggings and from the defendant and A.[14] Specifically, Madel explained that she developed two separate DNA profiles from two samples submitted to her: one was taken from the swabbing of the exterior hips and waistband of the leggings, and the other from the swabbing of the interior waistband of the leggings. She also explained that DNA profiles had been generated from known samples of the defendant and A. Madel testified that, after she compared the DNA types from known samples of the defendant with the samples from the leggings, the defendant was eliminated as a contributor as to both samples from the leggings. Additionally, Jennifer Green, another state forensic examiner, testified regarding the samples taken from A's leggings, stating

---

[13] "An allele is defined as one or two or more alternative forms of a gene." (Internal quotation marks omitted.) *State* v. *Walker*, 332 Conn. 678, 685 n.4, 212 A.3d 1244 (2019). The allele table prepared by Madel contained four DNA profiles—two unknown profiles generated from the samples taken from the leggings, and two known profiles from the defendant and A—and this table formed the basis for her conclusions after comparing the four DNA profiles.

[14] During cross-examination of Madel, the prosecutor offered into evidence exhibit 57A, the allele table prepared by Madel but with various numbers on that table highlighted in yellow. This is the same allele table that the trial court admitted into evidence as defendant's exhibit N during defense counsel's direct examination of Madel, except that the one submitted by the prosecutor included a horizontal yellow line going through the sample from the defendant and yellow highlights over various other numbers. Although defense counsel objected to the state's exhibit with the highlights, the court allowed the marked copy of the allele table to be admitted. On appeal, the defendant has not challenged the court's admission of exhibit 57A.

that, after testing the leggings in full, she did not recover any semen from the leggings.[15]

The defendant testified in his own defense.[16] Specifically, he denied all of the allegations against him. The defendant also explained that the reason he texted A so much was because A was suicidal, and he wanted A to know that "there was an adult who cared for her well-being . . . ." The defendant acknowledged that the amount of his correspondence with A "looks bad" but stated that "he was looking out for someone [he] thought was in need."

Following the conclusion of evidence, the case was submitted to the jury, which returned a verdict of guilty on all three counts. Thereafter, the court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective term of fifteen years of incarceration, execution suspended after seven years, five of which are mandatory, followed by ten years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim on appeal relates to the court's admission of testimony from his son, U, as to statements made to U by the defendant concerning the physical appearances of U's middle school female classmates. Specifically, the defendant claims that the court improperly admitted that testimony from U (1) pursuant

---

[15] The defendant also presented as witnesses Tobias Wasser, a forensic psychiatrist; Amy Klein, a staff attorney for the Department of Children and Families; Keith Blackman, a close, personal friend of A's mother; and Scott Romano, who has known the defendant for forty years and testified that the defendant is an "upstanding guy" who has a reputation "for honesty" and for behaving appropriately with children.

[16] Prior to the defendant testifying, the court canvassed him and determined that the defendant had "made a voluntary and intelligent decision regarding his desire to testify after consulting with his attorneys and after having been canvassed by the court."

to § 4-5 (b) of the Connecticut Code of Evidence as evidence of other sexual misconduct by the defendant to establish that he had a propensity to engage in aberrant and compulsive sexual misconduct, and (2) pursuant to § 4-5 (c) of the Connecticut Code of Evidence as evidence of the defendant's specific intent to obtain sexual gratification for purposes of the charge of sexual assault in the fourth degree. He also contends that he was harmed by the erroneous admission of that testimony.

The following additional facts and procedural history are relevant to our resolution of this claim. U, who was eighteen years old at the time of the defendant's criminal trial, testified that he was thirteen years old when he first met A, who was ten years old at the time, and that the two were friends. U also testified that he still loves the defendant and that he was testifying pursuant to a subpoena. U further testified that, when he was in middle school, the defendant talked to him "a lot" about girls. For example, U testified that, when the defendant drove U to middle school, the defendant would make comments about the bodies of young girls. At that point in U's testimony, the court asked the jury to exit the courtroom, and it addressed a request by defense counsel for the court to determine whether this type of uncharged misconduct evidence should be allowed, as defense counsel argued that it was "clearly prejudicial" and not probative of whether the defendant sexually assaulted A. The prosecutor countered that U's testimony concerned "the defendant's likeness toward young girls," and, in this case, that the state had to prove that the defendant had touched an eleven year old girl. The prosecutor, however, stated that the proffered testimony did not concern "uncharged misconduct because it's not a crime, what [the defendant] did. But it is relevant to the jury to understand that this defendant has in the past looked at young girls and made

inappropriate comments about them, likes the bodies of young girls, and that the victim here was an eleven year old girl. And this witness will also testify about comments that [the defendant] made about the eleven year old victim in this case. So, it's incredibly relevant." The court then asked the prosecutor to present an offer of proof.

Outside the presence of the jury, the prosecutor asked U about the comments made by the defendant when he would drop U off at middle school. U testified that the defendant would comment on the bodies of the young girls by saying things like, "X has a nice butt, Y is very pretty, that sort of thing." The girls who were the subjects of the comments ranged in age from twelve to fourteen.

Thereafter, a colloquy occurred between the court, defense counsel and the prosecutor,[17] after which the

---

[17] The following colloquy transpired:

"The Court: . . . I think right now the issue deals with whether this is uncharged misconduct or character evidence or propensity evidence or what this evidence is going toward. So, what's . . . the defense argument here?

"[Defense Counsel]: I think it's—I can't defend it. I can't defend it. It's not what he's accused of. And, if he said it, I don't think it shows his propensity to commit a sex crime. It's a comment. And, you know . . . now I have to have a trial within the trial on why each one of these comments was made, how many of them were made, to whom were they passed, what . . . was the context in which they were made, and so on. And so, it becomes this whole separate issue which I may prevail or I may not prevail. But, in the end, [the defendant is] going to be prejudiced by [the jury] hearing this testimony, which doesn't show that he's more or less likely to commit a sex crime.

\* \* \*

"The Court: Okay. . . . So, obviously, questions relating to anything that was said regarding [A] in this particular case . . . is a separate issue from basically what you want to ask now, which is, he's commented about a variety of other eleven year old girls; is that . . . where we're at? And, do we know—is it going to be as generic as what you just said?

"[The Prosecutor]: The three . . . questions that I just asked, Your Honor, are the questions I intended to ask [U]. That's his—that the defendant had interest in young girls and would comment sexually on their bodies.

"The Court: Okay."

court took a brief recess. Subsequently, on the record, the court concluded that the proffered testimony about the defendant's statements to U was admissible on two grounds and that the prejudicial effect of the testimony did not outweigh its probative value. First, pursuant to § 4-5 (c) of the Connecticut Code of Evidence,[18] the court found that the testimony was admissible because, with respect to the charge of sexual assault in the fourth degree, it related to the issue of the defendant's specific intent[19] to subject A to sexual contact for the purpose of obtaining sexual gratification, which is an element of the offense that the state was required to prove.[20]

[18] See footnote 2 of this opinion.

[19] In support of its ruling to admit the evidence, the court relied on *State* v. *Juan J.*, 344 Conn. 1, 22, 276 A.3d 935 (2022), in which our Supreme Court stated that "sexual assault in the fourth degree is a specific intent crime, requiring the state to prove that the defendant acted with the intent to make 'contact with the intimate parts of a person . . . for the purpose of sexual gratification of the actor' . . . ." See also *State* v. *Jose A. B.*, 342 Conn. 489, 534–35, 270 A.3d 656 (2022).

[20] Although, as a general rule, evidence of prior misconduct is inadmissible "to prove the bad character, propensities, and criminal tendencies of a defendant, this evidence may be admissible for other purposes. For example, prior misconduct evidence may be relevant because it is probative of and material to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency. . . . The absence of mistake or accident exception . . . is a close corollary of the intent exception: evidence of prior misconduct may be admissible for the purpose of showing that an action was intentional and not mistaken or accidental. . . .

"Our case law distinguishes between using evidence to prove an act and using evidence to prove intent. . . . Because intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, [when] available, is often relied [on]. . . .

"[Our Supreme Court has] noted the fine line between using uncharged misconduct to prove intent and using it to show the defendant's bad character or propensity to commit the crime charged. . . . In light of these concerns, the state's introduction of uncharged misconduct is properly limited to cases in which the evidence is needed to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove." (Citations omitted; internal quotation marks omitted.) *State* v. *Juan J.*, 344 Conn. 1, 18–20, 276 A.3d 935 (2022). But see *State* v. *Marcello E.*, 351 Conn. 345, 361, 330 A.3d 577

Second, pursuant to § 4-5 (b) of the Connecticut Code of Evidence, the court found the evidence to be admissible on the issue of propensity. In making this determination, the court stated: "In order for [it] to properly evaluate [the proffered evidence], [it had to] look at three considerations:[21] one, that the evidence that's being proposed is not too remote in time; two, that it is similar to the events as charged, that the conduct is similar enough that it is relevant and relates to the type of offenses charged; and that it was committed upon persons of a similar nature to those that are being charged in this particular case." (Footnote added.) The court concluded that "the evidence in this case does support all three of those findings, in that the claimed time frame . . . is in close proximity to the allegations that are being made in this particular case. . . . The allegations are, in fact, similar in that they address what could be classified as an attraction to, or an observation

(2025) (because assailant's specific intent was undisputed, "cumulative nature of the prior misconduct evidence [which was probative on the issue of specific intent] exacerbated its prejudicial impact because it increased the risk that jurors would presuppose the defendant's identity as the assailant, [which was] a determinative and disputed fact at trial").

[21] "[A]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused. . . . Nor can such evidence be used to suggest that the defendant has a bad character . . . ." (Internal quotation marks omitted.) *State* v. *Juan J.*, 344 Conn. 1, 15, 276 A.3d 935 (2022). "[Our Supreme Court, however] has recognized an exception to the general rule for sexual offenses: evidence of uncharged sexual misconduct, assessed under a liberal standard, is admissible and relevant to prove that the defendant had a propensity or a tendency to engage in the crime charged only if it is: (1) . . . not too remote in time; (2) . . . similar to the offense charged; and (3) . . . committed upon persons similar to the prosecuting witness. . . . The probative value of the evidence must also outweigh its prejudicial effect. . . . This exception is codified in § 4-5 (b) of the Connecticut Code of Evidence. The uncharged misconduct at issue, if . . . offered for propensity . . . [requires] the trial court to determine whether it was not too remote in time, whether it was far more frequent and severe than the charged misconduct, and whether the probative value of the evidence outweighed its prejudicial impact." (Citations omitted; internal quotation marks omitted.) Id.; see also *State* v. *DeJesus*, 288 Conn. 418, 476–77, 953 A.2d 45 (2008).

in a sexual manner, to a child that is in the same age range as [A] . . . . And I think that that really covers both two and three . . . because it certainly is committed—or the misconduct, so to speak—is committed upon persons of a similar age group and time frame to [A] in this particular case. I will also note that the evidence is not so egregious or so distinct from the evidence in this particular case. And what I mean by that is that, for instance, here, we're talking about a touching. Perhaps if the propensity or misconduct evidence then related to an actual sexual assault in the first degree where there might be allegations of intercourse or something such as that, then I think that there's a stronger argument to say that its prejudicial effect [outweighs] the probative value. But, in this case, the testimony is similar in nature to that which is being alleged—is not so egregious or indistinguishable for the jury and can be, in fact, appropriately addressed and distinguished in the jury's evaluation of this case. And, so, I am going to make a finding that it is relevant. It goes to issues in terms of the elements of the offense, as you've heard my ruling with regard to the misconduct and the propensity, and that its relevancy is not outweighed by its prejudicial effect. Having said that, I am happy to include an immediate cautionary instruction to the jury." In accordance with a request from defense counsel, before U resumed his testimony the court provided a cautionary instruction to the jury.[22] Thereafter, the prosecutor resumed questioning U.

---

[22] Specifically, the court instructed the jury as follows: "Good afternoon, everybody. I apologize for that delay. So, before we continue with this next witness, I am going to give you the following instruction. And you've heard me say that I will also be instructing you at the end, but I'm going to instruct you now as well just so you understand how to address this particular testimony. The state is offering evidence of the defendant's comments to his son regarding other school-aged girls. The comments are not crimes in and of themselves. The defendant has not been charged with any offense related to these alleged comments. In a criminal case such as this, in which the defendant is charged with a crime involving sexual misconduct, evidence of the defendant's commission of other sexual misconduct is admissible

In the presence of the jury, U testified that, when the defendant would drop him off at middle school, the defendant would make comments about some of the middle school girls, such as "[t]his girl has a nice butt, this girl . . . is pretty, something along those lines." U further testified that the defendant specifically commented on the bodies of the middle school girls, including their "butt[s]" and "overall figure"; that is, he would say that "she has an overall nice figure or just overall nice body."[23] Subsequently, U was asked whether the defendant ever spoke to him about A or made comments about A's body, to which U replied, "[y]ep." When asked what the defendant would say, U replied that he would say "[m]ostly the same thing he would say with the girls when he dropped [U] off at middle school, nice butt, nice figure." U was then asked whether the defendant ever made comments about sexual acts that he wanted to do with A, to which U responded affirmatively, stating that "[the defendant] said when A was eighteen he

and may be considered to prove that the defendant had the propensity or tendency to engage in the type of criminal sexual behavior with which he is charged. However, evidence of prior misconduct, on its own, is not sufficient to prove that the defendant is guilty of the crimes charged in the information. It is for you to determine whether the defendant committed any uncharged sexual misconduct and, if so, the extent, if any at all, to which that evidence establishes that the defendant had the propensity or tendency to engage in criminal sexual behavior. Please bear in mind as you consider this evidence, that at all times the state has the burden of proving that the defendant committed each of the elements of the offenses with which he is charged in the information. And I remind you that the defendant is not on trial for any act or comment or conduct other than those that have been charged in the information. With that in mind, the state may continue." The court provided a similar instruction in its final charge to the jury.

[23] On direct examination, the defendant was asked whether he ever made comments to U about dating or going out with girls, to which he replied: "I would maybe comment to him, bring him to school, do you think this person is somebody you want to talk to? Do you think that [person is] attractive. Just to kind of try to get his viewpoint on people—other kids in his class." On cross-examination, the defendant acknowledged that he would point out middle school girls to U and ask U if he thought those girls were attractive.

would—like, if he could have sex with her when she was eighteen, he would.”

U also testified that, one time, he saw the defendant and A in the defendant's bedroom, at the foot of the bed, with A on the bed and the lights dim or off. He testified further regarding the interactions between the defendant and A while in the dining room section of the kitchen in the defendant's home. For example, the defendant would give A a hug and sometimes, when A was sitting at the table, would come up behind her. U described their interactions as follows: “I would say amicable when he came up behind her. Like, it was definitely very—it would be how he would, like, interact . . . not exactly, but it would be sort of how he would interact with his ex-wife when he came up to the table. It's a very amicable, friendly . . . . [H]e didn't do that to me, he didn't do that to [U's] mom [or to A's] mom either. . . . [I]t was just [A]; it was amicable interaction [similar to how he acted with his former wife] [b]ut on a more toned-down scale . . . .”

With this background in mind, we now turn to the defendant's claim. The defendant challenges both grounds under § 4-5 of the Connecticut Code of Evidence on which the court admitted the challenged testimony. With respect to the propensity ground, the defendant contends that U's testimony about the defendant's statements concerning middle school girls did not concern “other sexual misconduct” within the meaning of § 4-5 (b); in other words, “the defendant's speech to his son is outside of the rule's purview as a matter of law,” as it cannot constitute “sexual misconduct” and was neither improper nor unlawful, despite the fact that it could be considered “off-putting or inappropriate.” The defendant further asserts, as to § 4-5 (c), that the court improperly determined that the testimony “was relevant under § 4-5 (c) for the nonpropensity purpose of proving that the defendant had the specific intent to

obtain sexual gratification as required under the charge of sexual assault in the fourth degree." According to the defendant, "the state did not need evidence of uncharged acts (comments) by the defendant to prove that he intended to obtain sexual gratification," there was "no real probative value" to the testimony, and "it was highly prejudicial to the defendant, particularly because the trial court explicitly identified it to the jury as 'sexual misconduct.' "

The state counters by asserting that the court properly admitted U's testimony about the defendant's comments, under both subsections (b) and (c) of § 4-5 of the Connecticut Code of Evidence, and that, even if, arguendo, any error occurred, the defendant has failed to meet his burden of demonstrating that the error was harmful. We agree with the state's argument regarding harm. We conclude that, even if we were to assume, without deciding, that there was error in the court's admission of U's testimony regarding the defendant's statements about the middle school girls, either as evidence of the defendant's propensity to engage in aberrant and compulsive sexual misconduct or on the issue of his specific intent to obtain sexual gratification to prove an element of the crime of sexual assault in the fourth degree, the defendant has failed to establish the harmfulness of the alleged error.

When, as in the present case, an evidentiary error is nonconstitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. See, e.g., *State* v. *Mark T.*, 339 Conn. 225, 251, 260 A.3d 402 (2021). "[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony [in the prosecution's case] . . . whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination

otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [C]redibility contest[s] characterized by equivocal evidence . . . [are] a category of cases that [are] far more prone to harmful error. . . . When a case involves the improper admission of uncharged misconduct evidence, the most relevant factors to be considered are the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact." (Citation omitted; internal quotation marks omitted.) *State* v. *Marcello E.*, 351 Conn. 345, 367–68, 330 A.3d 577 (2025).

In the present case, the jury had before it other testimony from U specifically concerning A that the defendant has not challenged on appeal; that is, U testified that the defendant had made comments about A's body that were nearly identical to his comments about the middle school age girls—that A had a "nice butt" and a "nice figure." Defense counsel fully cross-examined U on this point, and the defendant does not claim otherwise on appeal. The existence of this additional testimony directly pertaining to A that has not been challenged diminishes any impact of the allegedly improperly admitted evidence on the trier of fact. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 232, 215 A.3d 116 (2019) (evidentiary ruling was harmless when challenged statement of witness, although generally important to state's case, was "largely cumulative of other evidence and also corroborated by other evidence on material points"); *State* v.

*Rogers*, 183 Conn. App. 669, 688, 193 A.3d 612 (2018) (court's allegedly improper admission of certain evidence and testimony was harmless when that evidence and testimony "were cumulative and paled in comparison to other unchallenged evidence before the jury"), aff'd, 344 Conn. 343, 279 A.3d 184 (2022).

With respect to the strength of the state's case, our Supreme Court has "described a child sexual abuse case lacking conclusive physical evidence, when the prosecution's case rests on the credibility of the victim [as] not particularly strong, even when otherwise sufficient to support a conviction." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 293, 973 A.2d 1207 (2009). Nevertheless, "we must be mindful that [t]he sexual abuse of children is a crime [that], by its very nature, occurs under a cloak of secrecy and darkness. It is not surprising, therefore, for there to be a lack of corroborating physical evidence . . . . Given the rarity of physical evidence in [sexual assault cases involving children], a case is not automatically weak just because a child's will was overborne and he or she submitted to the abuse . . . ." (Internal quotation marks omitted.) *State* v. *Henry B.-A.*, 234 Conn. App. 197, 226–27, 342 A.3d 1063 (2025).

The record in the present case demonstrates that, even though physical evidence is lacking and the defendant was eliminated as a contributor to the DNA profile generated from the sample from A's leggings, there was other evidence before the jury that, although not overwhelming, "was not so weak as to be overshadowed" by the allegedly improper admission of U's testimony regarding the defendant's statements about the middle school age girls. (Internal quotation marks omitted.) Id., 227; see, e.g., *State* v. *Adam P.*, 351 Conn. 213, 240–41, 330 A.3d 73 (2025) ("state's case, even without physical or forensic evidence, was strong" when "victims testified extensively, and largely consistently about

the defendant's actions" and testimony of other witnesses corroborated victims' timelines of events and certain details, "such as the color or makeup of the house in Stratford" where sexual abuse allegedly occurred); *State* v. *Gary S.*, 345 Conn. 387, 420, 285 A.3d 29 (2022) ("although there was no forensic evidence collected, the state presented numerous witnesses during trial," including child sexual assault victims, who described in detail assaults to which defendant had subjected them); see also, e.g., *State* v. *Thompson*, 266 Conn. 440, 482, 832 A.2d 626 (2003) ("we see no reason why the nature of the evidence as circumstantial rather than direct should bear on the assessment of the strength of the state's case").

A testified at length regarding the sexual abuse she endured at the hands of the defendant. In that testimony, A recalled a number of factual details, apart from the sexual abuse, concerning the circumstances surrounding the abuse, many of which were corroborated by text messages or testimony from U. For example, A described one occasion of sexual abuse that occurred when she and the defendant watched "How the Grinch Stole Christmas," and, in one of the text messages, the defendant thanked A for watching the "Grinch" with him. U testified that he recalled seeing A and the defendant in the defendant's bedroom, with the defendant at the foot of the bed and A on the bed and the lights dimmed, which was consistent with A's testimony about the first time she and the defendant were in his bedroom, and that every time they were in the bedroom, the defendant would dim the lights. The defendant's testimony corroborated many of the factual details to which A testified, including that his dog had humped A's leg, that he had "Grinch" pajama pants and would change into them when he came home from work, that he would hug A from behind, that the two of them would watch movies together, that he watched

"How the Grinch Stole Christmas" with A, and that, at least one time, A sat on his lap during a movie. A also testified about inculpatory statements of the defendant in which he told A that someday she was going to see him "through plate glass" and that he was never going to see U again because A was "gonna tell." A also testified about an instance when she told the defendant that his dog, which had humped her leg, had "raped" her, to which he replied that the dog was "lucky."

In addition, U testified that the defendant said that he would have sex with A when she reached eighteen years of age, if he could. Moreover, other unchallenged testimony from U corroborates A's testimony regarding her interactions with the defendant in the dining room area of his kitchen, namely, that the defendant would give A a hug and come up behind her when she was sitting at a table. U also described the interactions of the defendant and A as being similar to how the defendant would act with his former wife.

Furthermore, the state submitted into evidence as an exhibit the 893 pages of text messages between A and the defendant. Notably, those voluminous texts covered a short period of time from November, 2018, to February, 2019. With respect to the text messages, McClintock acknowledged that there was no "direct evidence [in the texts] of a sexual relationship" between A and the defendant but testified that the volume of text messages raised concerns because "it seemed odd that a babysitter would be texting this volume of things to [the] individual given to babysit." The defendant even admitted that the amount of his correspondence with A "look[ed] bad." Moreover, one text contained sexual innuendo—when A sent the defendant a text stating, "[y]ou want it . . . [y]ou can have it," regarding a photograph she had given him, he replied, "[y]ou or the picture? Lol." Despite the lack of explicit references to a sexual relationship in the texts, the jury reasonably could have

inferred the existence of some type of an inappropriate relationship between the forty-two year old defendant and the eleven year old child victim, given the volume and content of the texts, many of which contained sentiments that the defendant himself characterized as "creepy," as previously detailed in this opinion.

Other witnesses for the state included L, A's good friend, who testified that, one time, she and A went to the defendant's house and he gave them money, that L saw the defendant give A a long hug, and that, with L's encouragement, A disclosed the abuse to A's mother. Murphy-Cipolla testified for the state regarding the forensic interview process and delayed disclosure of child sexual abuse, explaining that a sexually abused child may protect the abuser. She also testified, after viewing the video recording of the forensic interview in court, that she had "observed some of the stages of grooming that [she] talked about earlier," including that, "when a person grooms a child they also befriend the family," and that, on the basis of her experience, "there were elements of the interview that supported [A's] disclosure." Her testimony that "abusers . . . try to . . . ingratiate themselves to the family that they're someone to be trusted and they can help out with something," is particularly relevant to this case, which involves such a situation. In addition, K, A's aunt, testified about changes she had noticed in A's personality during the time leading up to A's disclosure to her of the sexual abuse.[24]

With respect to the other factors we must consider in our harmless error analysis; see *State* v. *Marcello E.*, supra, 351 Conn. 367–68; U's testimony concerning the defendant's statements about the bodies of middle school age girls was not particularly important to the prosecution's case. That is so for a few reasons. First,

---

[24] See footnote 7 of this opinion.

whether the defendant made inappropriate *comments* about middle school age girls in general was not a focal point of the trial in this case; rather, the primary issue was whether the defendant engaged in *sexual contact or conduct* with A as described in the operative information. Second, U's testimony concerning the defendant's comments about middle school girls was a minimal part of the defendant's trial, in which the state presented testimony from eight witnesses over the course of five days, and the defense presented testimony from nine witnesses over the course of three days. In addition to U's brief testimony about those comments, the subject arose during the defendant's testimony on direct and cross-examination, and the prosecutor made only one general comment about U's testimony about middle school age girls during closing remarks. In total, of the more than 1400 pages of trial transcripts, the subject of the defendant's comments about middle school girls that was before the jury[25] encompasses approximately ten pages.

Accordingly, after applying the factors for determining when an improper evidentiary ruling is harmless in a particular case, we cannot conclude that the jury's verdict was substantially swayed by the alleged error. See, e.g., *State* v. *Myers*, 352 Conn. 770, 784–85, 338 A.3d 1088 (2025). In light of the other testimony before the jury from U that was similar in nature to the challenged testimony, as well as U's unchallenged testimony about the defendant's comments that directly pertained to A, the 893 pages of text messages between the defendant and A over a short period of time, and the relative strength of the state's case, despite the lack of physical evidence, U's challenged testimony "had at best a minimal impact on the jury"; *State* v. *Martin V.*, 102 Conn.

---

[25] We note that a lengthy discussion occurred between the court and counsel concerning the admissibility of U's testimony about the defendant's statements outside of the presence of the jury.

App. 381, 391, 926 A.2d 49, cert. denied, 284 Conn. 911, 931 A.2d 933 (2007); and "it was not likely that the [challenged evidence] was very damaging to the defense." *State* v. *Gallo*, 135 Conn. App. 438, 462, 41 A.3d 1183 (2012), appeal dismissed, 310 Conn. 602, 78 A.3d 854 (2013). Therefore, we have a fair assurance that the alleged error did not substantially affect the verdict. See, e.g., *State* v. *Myers*, supra, 784–85.

II

The defendant next claims that the prosecutor engaged in impropriety that deprived him of a fair trial. This claim concerns the prosecutor's cross-examination of Madel with respect to her conclusion that the defendant was eliminated as a contributor to the samples taken from A's leggings. Specifically, the defendant claims that the prosecutor, during cross-examination, improperly suggested "that the defendant's DNA may have been a match despite Madel's analysis eliminating him as even a possible contributor to the DNA on the leggings," asked "a [series] of questions that distorted Madel's testimony," and "suggested to the jury during cross-examination that it should review [the] DNA evidence under a method unsupported by the evidence." The defendant also contends that the alleged prosecutorial impropriety deprived him of a fair trial. We are not persuaded.

The following additional facts are relevant to this claim. As stated previously in this opinion, Madel testified regarding DNA testing she had performed on two samples taken from A's leggings. A different analyst tested the known samples from the defendant and A to avoid cross contamination. Madel explained the process used in developing a DNA profile, which includes extracting DNA from the samples and purifying it, quantifying the DNA to determine the amount of DNA, if any, that has been extracted, then amplifying the DNA

by creating copies of the targeted DNA, and analyzing and interpreting the DNA to generate a DNA profile, which is represented by a series of numbers.[26] In this case, Madel "developed two separate DNA profiles from the two different samples that [she] processed." The type of profile that was developed for each sample contained a mixture of more than one person's DNA for each sample, i.e., the profile generated was not a single source profile, and the profiles were mixtures of male and female. In other words, she generated one overall profile for each sample, with multiple contributors to each profile, and each profile had at least one male contributor. Madel thereafter compared the DNA profiles from the samples from the leggings with the DNA profiles developed from the known samples of the defendant and A to "see if the types in the known profile[s] [were] present in the types in the evidentiary profile." These results were represented in the allele table that was admitted into evidence, which contained four profiles—the two known profiles of the defendant and A, and the two profiles developed from the samples from the leggings. Madel concluded that at least three people contributed to the DNA profile developed from the sample taken from the exterior waistband of the leggings, and at least two people contributed to the DNA profile developed from the sample from the interior waistband of the leggings. Madel testified that she concluded that the defendant was eliminated as a contributor to the DNA profiles generated from both samples

---

[26] "A DNA profile is determined by looking at different locations on a genetic chain." (Internal quotation marks omitted.) *State* v. *Police*, 343 Conn. 274, 302, 273 A.3d 211 (2022). In the present case, Madel looked to twenty-four locations on the genetic chain. "A person has, at most, two distinct genetic markers (alleles) at any location—one from [his] mother and one from [his] father. A person will often have the same genetic marker from both [his] mother and [his] father, so a single location on an individual DNA profile can have either one or two alleles. If there are three alleles at a location, then the sample contains DNA from more than one person." (Internal quotation marks omitted.) Id.

taken from the leggings and that A was presumed to be a contributor to both samples. As Madel explained: "You can include somebody as a contributor if it's a mixture and their types are . . . conclusively there. You can have an inconclusive conclusion where . . . there's not enough information . . . to say someone's included or excluded and you can eliminate somebody." When asked whether her conclusion that the defendant was eliminated as a contributor to both profiles from the samples meant "that he can't be the person who deposited the DNA on . . . that evidence," Madel responded: "I can't give an identity statement. I can just say that his types are not present—not detected in the evidentiary profile that I developed."

During cross-examination, the prosecutor questioned Madel about "touch DNA" and the primary and "secondary transfer" of DNA.[27] Thereafter, the prosecutor offered, and the court admitted into evidence, exhibit 57A—a copy of the same allele table that already had been

[27] Our Supreme Court has recognized that "touch DNA does not necessarily indicate a person's direct contact with the object. Rather . . . abandoned skin cells, which make up touch DNA, can be left behind through primary transfer, secondary transfer, or aerosolization. Primary or 'touch' transfer occurs, for example, when you directly touch or pick up an object. Secondary transfer, alternatively, occurs when, for example, person A bleeds onto a table and, subsequently, person B walks by the table, accidentally brushes against it, and then sits in a chair. Person A's blood can potentially be on that chair via secondary transfer, although person A personally never came into contact with the chair. Finally, skin cells can be deposited on an object through aerosolization, which . . . occurs when, for example, a person speaks, breathes, coughs, or sneezes on or near an item." *State* v. *Dawson*, 340 Conn. 136, 153–54, 263 A.3d 779 (2021); see also *State* v. *Glass*, 214 Conn. App. 132, 140 n.15, 279 A.3d 203 (2022). Madel described touch DNA as "when a person comes in contact with something and leaves skin cells behind, and that's where you get the DNA from. It is a much smaller amount of DNA compared to a blood sample or a semen sample or a saliva sample." Madel further explained that "[p]rimary transfer is when DNA is transferred from a person to object or person to person. Secondary transfer is when DNA is transferred from a person to an object to a person, [or] a person to an object to an object . . . ."

admitted into evidence as defense exhibit N, which included the results of the four different profiles but with certain numbers or alleles highlighted. See footnote 14 of this opinion. The prosecutor then continued cross-examining Madel about her conclusion that the defendant had been eliminated as a contributor to the DNA from the leggings, and Madel explained that the defendant was "eliminated because his profile was not detected at . . . all sites [on the allele table] and [because] the overall interpretation [was] that he [was] not a contributor to this profile." The prosecutor responded by asking, "you're not saying that [the defendant] didn't touch those leggings, are you?" Madel answered that she could not say if the defendant ever touched the leggings, as it is "possible to touch something and not leave enough DNA behind to be detected." Throughout cross-examination, the prosecutor repeatedly asked questions as to whether the DNA results indicated whether the defendant ever touched the leggings.

In connection with exhibit 57A, the prosecutor asked whether there was any "hard and fast rule that something has to be there for all sites," and Madel answered: "Correct, there's no certain amount of alleles that have to—or types that have to be present in order to be included or excluded. It's looking at the profile overall, looking at all twenty-four sites, looking at the peak heights of the profile to the major, the minor, the contributors and where somebody might be dropping out, where they're not dropping out and you make the conclusion for the overall profile, not just at each—one each—at each site, individually," as it depends on the "[i]ndividual sample." She agreed with the prosecutor when asked whether "you could have less than twenty-four and still have an inclusion . . . ." When the prosecutor, utilizing the allele table in exhibit 57A, pointed out that the defendant's "profile" showed up at various

testing sites on the table, Madel clarified that the defendant's "types" were at the sites, but that some of those types were not unique to an individual, after which the prosecutor again stated, "[b]ut that is part of his *profile,*" and Madel replied, "[h]e does have those *types,* yes." (Emphasis added.) Throughout his cross-examination of Madel, the prosecutor repeatedly asked questions pertaining to whether the results depicted in exhibit 57A supported a conclusion that the defendant never touched the leggings. Defense counsel also raised multiple objections, most of which were overruled by the court.[28]

---

[28] Specifically, the following colloquy transpired during cross-examination:

"[The Prosecutor]: Now, when you say that [the defendant] was eliminated, okay, what you're saying is that his—based on whatever protocol you use, his profile was not detected in sufficient quantities that you could either say, inclusive or included, correct?

"[Madel]: His profile was—

"[Defense Counsel]: Objection. I'm not quite sure what he's asking.

"[The Prosecutor]: It's cross-examination, Your Honor, and I want to make sure that—

"The Court: And the question is—if your issue is that you're unclear, is the witness clear as to the question?

"[Madel]: —I—he is eliminated because his profile was not detected at . . . all sites and the overall interpretation is that he is not a contributor to this profile.

"[The Prosecutor]: Okay. And—but it's not required that he be there at all sites, is it, for you to make an inclusion?

"[Defense Counsel]: Objection, he's testifying.

"[The Prosecutor]: It's cross-examination, Your Honor.

"The Court: . . . I agree. It's cross-examination. The witness can, certainly, answer whether that's right or wrong. So, it's overruled.

"[The Prosecutor]: And, you're not saying—you're not saying that [the defendant] didn't touch those leggings, are you?

"[Defense Counsel]: Objection, she wasn't asked if [the defendant] touched them.

"The Court: Overruled.

"[Madel]: I'm not saying that he didn't touch it, no. I can't say if he touched it or not.

"[The Prosecutor]: Okay. He could very well have touched it and just not left a profile there, isn't that correct?

"[Defense Counsel]: Objection, calls for speculation.

"The Court: Overruled.

"[Madel]: Yes, it's possible to touch something and not leave enough DNA behind to be detected.

"[The Prosecutor]: And, in terms of your own protocols, okay, I understand that you had somebody review it, okay, and you came to the conclusion with the person who reviewed it that you made an elimination, correct?

"[Madel]: Correct.

"[The Prosecutor]: Okay, but there's no hard and fast rule that something has to be there for all sites, correct?

"[Madel]: Correct, there's no certain amount of alleles that have to—or types that have to be present in order to be included or excluded. It's looking at the profile overall, looking at all twenty-four sites, looking at the peak heights of the profile to the major, the minor, the contributors and where somebody might be dropping out, where they're not dropping out and you make the conclusion for the overall profile, not just at each—one each—at each site, individually.

"[The Prosecutor]: So, it depends on the individual case?

"[Madel]: Individual sample.

"[The Prosecutor]: And, you could have less than twenty-four and still have an inclusion, correct?

"[Madel]: Less than twenty-four?

"[The Prosecutor]: Twenty-four sites, less . . . than the full twenty-four sites and still have an inclusion.

"[Madel]: Yes, that's possible. You can have DNA—yes.

"[The Prosecutor]: Okay. So, let me just show you what's been marked as . . . state's exhibit 57A. . . . [T]he first table, that line [002] are the defendant's profile in each site, correct?

"[Madel]: His types at each . . . different testing site, yes.

"[The Prosecutor]: Okay. Cause that's all you're . . . measuring. You're not measuring whether or not somebody actually touched something. You're measuring . . . whether or not the sites are showing up, correct?

"[Madel]: Well, for a known sample you would expect to have results at every single site, because it's a known profile, there's plenty of DNA there.

"[The Prosecutor]: You're talking about . . . the known?

"[Madel]: The knowns, [002], yes.

"[The Prosecutor]: Okay. I'm just . . . we're talking about the knowns, but what you're actually measuring on the unknown is not whether or not they touched something, but whether or not their profile is showing up?

"[Madel]: Right. I'm seeing if there's any DNA there, yes.

"[The Prosecutor]: Right.

"[Madel]: Not that if they touched it, or they didn't touch it, who touched it, when. None of that.

"[The Prosecutor]: Right. Somebody . . . can touch it and not have their profile show up, correct?

"[Madel]: That's possible, yes.

"[The Prosecutor]: And that would be an exclusion?

"[Madel]: Yes, if their DNA . . . if the types aren't there, that would be an exclusion, yes.

"[The Prosecutor]: Even though they touched it?

"[Madel]: If they touched it, yes.

"[The Prosecutor]: And . . . but it doesn't show up?

"[Madel]: Right. If I didn't detect the profile and they're not there then,

I'd have to eliminate, yes.

"[The Prosecutor]: Okay. . . . [B]ut that doesn't determine whether or not they touched it?

"[Madel]: Correct.

"[The Prosecutor]: Okay. And, if someone didn't touch it . . . their profile could show up on it because of secondary transfer, is that correct?

"[Madel]: That is possible, yes.

"[The Prosecutor]: Okay. So . . . and I know . . . that under your evaluation on this case, you've excluded it, but if you look at state's exhibit 57A, and you look at the top box in each table, okay, those are examples of where the defendant's profile shows up.

"[Defense Counsel]: I'm gonna—

"[The Prosecutor]: Is that correct?

"[Defense Counsel]: —I'm gonna object because that's not exactly true.

"The Court: Well, that's what the witness . . . who is an expert in this field, can testify to. . . .

"[Madel]: So, looking at, say, that first box there, that—next to the item number on the top, it says D3S1358, that's like one of the testing sites. You can see my results for the [001-001] was types 14, 15, 17 and 18.

"[The Prosecutor]: Okay. And [the defendant's] profile shows up there?

"[Madel]: The types that [the defendant] has at that site, yes, are there—

"[The Prosecutor]: Okay.

"[Madel]: —but that's not unique to an individual. Other people do have those types so, that doesn't—

"[The Prosecutor]: Other people do have . . .

"[Madel]: —mean, that those are—they came from him.

"[The Prosecutor]: But that is part of his profile?

"[Madel]: He does have those types, yes.

"[The Prosecutor]: Okay. And, in each one of those, okay, where there's a yellow marker, what's listed as his profile shows up in each of those sections.

"[Defense Counsel]: Objection, that's not what the exhibit shows.

"[The Prosecutor]: It's cross-examination, Your Honor.

"The Court: Sustained. It's a question. Does . . . it show up?

"[Madel]: At each—where he highlighted, so, the next one [genetic marker vWA], the defendant is a 16 [and] 17, and in that evidentiary profile there's a 16 [and] 17. The next one . . . .

"[The Prosecutor]: Okay, but they're the same as—and, I don't want to go through each box. It's where . . . the markings are, that particular number shows up that's reflected as also showing up for the defendant.

"[Madel]: Some of them, yes.

"[The Prosecutor]: Okay, some of them.

"[Madel]: Yes.

"[The Prosecutor]: Okay.

"[Madel]: Not all of them. Yes.

"[The Prosecutor]: Not . . . all of them. Okay.

"[Madel]: Yes.

"[The Prosecutor]: And you made a determination that there is an exclusion, correct?

"[Madel]: Correct.

Prior to the commencement of evidence the next day, defense counsel orally moved for a mistrial, arguing that the state's highlighted allele table, exhibit 57A, and the prosecutor's questions on cross-examination of Madel pointing out that some of the alleles on the male sample are alleles on the defendant's profile was misleading and "propounded a false theory," and that the prosecutor thereby engaged in misconduct. The court denied the motion.

On appeal, the defendant contends that, during the prosecutor's cross-examination of Madel, "the prosecutor deliberately suggested to the jury . . . that the defendant's DNA may have been present on [A's] leggings even though [the defendant] had been eliminated as a possible contributor [which] . . . was contrary to Madel's testimony . . . . The prosecutor marked for the jury, on a full exhibit the jury would have with it in the jury room, each allele type within the defendant's DNA that matched an allele type found on the first sample taken from the leggings. The prosecutor thereby effectively invited the jury to assess whether enough alleles matched (using [the jurors'] own judgment for what seemed like enough) to convince [the jury] that the defendant's DNA was there, despite the lack of any evidentiary basis for such a procedure to analyzing DNA. . . .

"The prosecutor compounded this impropriety by repeatedly suggesting that the defendant's *profile* was found at individual sites, when a profile is indisputably composed of the entirety of the allele types found at all twenty-four test sites. By suggesting that the defendant's *profile* was found anywhere his allele types happened to be the same as allele types found in the test

---

"[The Prosecutor]: Okay. And you can't—as I said, but as you sit here today, you can't say whether or not he actually touched the item.

"[Madel]: I do not know if he touched it. No."

samples, the prosecutor created the potential for serious confusion on the part of the jury regarding precise and nuanced distinctions in nomenclature that easily may be . . . misunderstood . . . . Such misuse of the scientific terminology, even if not calculated to confuse the jury, certainly had a strong tendency to nullify the established science and Madel's expert testimony, which established that the threshold of the number of matching alleles had not been reached for the defendant to even be considered a *possible* contributor. In short, the science showed that there was *no possibility* that the defendant's DNA was in the tested samples; the prosecutor committed impropriety by inviting the jury to entertain such a possibility. . . . Accordingly, the jur[ors], equipped with the marked-up exhibit, [were] led to believe they could deliberate on whether *they thought* it seem[ed] like the defendant's DNA was on the leggings despite the expert's testimony." (Citations omitted; emphasis altered.)

In response, the state asserts that "[t]here was nothing even bordering on inflammatory regarding the state's cross-examination, which, at most, elicited two vague objections by the defendant that the court overruled." The state points out that "the defendant does not argue, nor does the record reflect, that the state ever argued to the jury what the defendant now believes it 'suggested' during cross-examination, i.e., that the jury could conclude that the defendant's DNA profile was found on the leggings despite Madel's conclusion that his profile was excluded. Rather, it simply argued that, notwithstanding Madel's conclusion of exclusion at the time of testing, the jury could consider whether the defendant had touched the leggings in the past, and any potential DNA left had been degraded through time and, in particular, through washing of the leggings. Thus, the state's theory was simple, and fully consistent with what Madel testified to—that the defendant's DNA

was not on the leggings, but that did not mean that he had not touched them in the past, and it is possible for DNA to degrade over time." (Emphasis omitted.) The state highlights the fact that the prosecutor "*never once disputed* Madel's ultimate conclusion that the [defendant] was *excluded* as a contributor to the DNA profile on the leggings" and merely sought to demonstrate that this conclusion "did not necessarily mean that the defendant had never touched the leggings in the past." (Emphasis in original.) Finally, the state contends that, even if the prosecutor "mistakenly used the word 'profile' " when referring to the twenty-four testing sites, rather than "the word 'type,' " any such misstatement did not rise to the level of impropriety, especially given that "Madel clarified in her answers that it was actually the types that were found on the leggings profile and not the full profile." (Emphasis omitted.) We agree with the state.

We first set forth our well established legal principles and standard of review pertaining to claims of prosecutorial impropriety. "It is well established that '[p]rosecutorial impropriety can occur during . . . the cross-examination of witnesses . . . .' " *State* v. *Diaz*, 348 Conn. 750, 770, 311 A.3d 714 (2024). "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . . *State* v. *Turner*, 181 Conn. App. 535, 557, 187 A.3d 454 (2018), aff'd, 334 Conn. 660, 224 A.3d 129 (2020); see also *State* v. *Taft*, 306 Conn. 749, 762, 51 A.3d 988 (2012)." (Internal quotation marks omitted.) *State* v. *Henry B.-A.*, supra, 234 Conn. App. 206. "In evaluating whether a defendant has carried that burden, [appellate courts] recognize that prosecutorial inquiries or comments that might be 'questionable' when 'read in a vacuum' often are, indeed, appropriate when

'review[ed] . . . in the context of the entire trial.' " *State* v. *O'Brien-Veader*, 318 Conn. 514, 524, 122 A.3d 555 (2015).

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial.[29] . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Footnote added; internal quotation marks omitted.) *State* v. *Henry B.-A.*, supra, 234 Conn. App. 206; see also *State* v. *Parris*, 352 Conn. 652, 658–59, 338 A.3d 1139 (2025).

"A basic and proper purpose of cross-examination of an expert is to test that expert's credibility. . . . Thus, [i]t is well established that an expert witness can be examined concerning the factual basis of his [or her]

---

[29] "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different [in the absence of] the sum total of the improprieties. . . .

"To determine whether the impropriety deprived the defendant of a fair trial, this court applies the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Parris*, 352 Conn. 652, 676–77, 338 A.3d 1139 (2025).

opinion." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, supra, 318 Conn. 525. Nevertheless, a "prosecutor has a heightened duty to avoid argument [or questioning] that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Reddick*, 174 Conn. App. 536, 564, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied, 583 U.S. 1135, 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018).

With these standards in mind, we turn to the merits of the defendant's claim. We conclude that the prosecutor's questions during cross-examination of Madel were not improper. First, we disagree with the defendant's contention that "the prosecutor deliberately suggested to the jury . . . that the defendant's DNA may have been present on [A's] leggings even though [the defendant] had been eliminated as a possible contributor." From our review of the entire transcript of the cross-examination of Madel, it is clear that the questions posed by the prosecutor during that cross-examination were intended to make the point that the defendant's exclusion as a contributor of the DNA found on the leggings did not necessarily mean that the defendant never touched the leggings. This was demonstrated at various times during the colloquy, including when the prosecutor asked, "[a]nd you made a determination that there is an exclusion," to which Madel replied, "[c]orrect." That was immediately followed by the prosecutor's question, "but as you sit here today, you can't say whether or not he actually touched the item," and Madel replied, "I do not know if he touched it."

The defendant's claim of prosecutorial impropriety centers on the prosecutor's questions regarding the allele table in state exhibit 57A. As stated previously; see footnote 14 of this opinion; both the defendant and the state separately offered that table into evidence

during direct and cross-examination of Madel, respectively, with the difference being that state's exhibit 57A included yellow highlighting of the defendant's DNA profile and various alleles that were not highlighted in defense exhibit N, which the court previously had admitted into evidence. Although defense counsel objected to the admission of the state's exhibit with the highlighting, the court admitted it into evidence. Given that Madel had generated the table as part of her DNA analysis and that the table was admitted into evidence, twice, by the court, it was not improper for the prosecutor to question Madel regarding that evidence and how the data therein formed the basis for her conclusion that the defendant was excluded as a contributor to the DNA on the leggings. The trial transcript shows that the prosecutor utilized exhibit 57A in questioning Madel regarding the fact that certain of the allele types in the defendant's DNA profile matched some of the allele types in the DNA profiles generated from the samples taken from the leggings. The defendant's claim that this questioning improperly suggested to the jury that it could make its own conclusion regarding the DNA evidence is unfounded and based on speculation. The prosecutor never stated that the jury could do so, and it would be speculative to conclude that the prosecutor impliedly encouraged the jury to do so simply by questioning Madel about the connection between the defendant's allele types and those found in the DNA profiles generated from the samples from the leggings.

As our Supreme Court has stated: "Our courts have recognized that it is usually not impropriety for a prosecutor to ask a question that may elicit objectionable testimony, let alone one—as in this case—that garners an objection that the trial court overrules, in favor of the prosecution. See, e.g., *State* v. *Holmes*, 169 Conn. App. 1, 15, 148 A.3d 581 (simply posing an objectionable

question does not amount to an actionable impropriety), cert. denied, 323 Conn. 951, 151 A.3d 847 (2016) . . . . Moreover, [a]rguing on the basis of evidence explicitly admitted [by the trial court] for that purpose cannot constitute prosecutorial [impropriety]." (Citations omitted; internal quotation marks omitted.) *State* v. *Graham*, 344 Conn. 825, 857–58, 282 A.3d 435 (2022). "A basic and proper purpose of cross-examination of an expert is to test that expert's credibility. . . . Thus, [i]t is well established that an expert witness can be examined concerning the factual basis of his [or her] opinion." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, supra, 318 Conn. 525. We cannot conclude that the prosecutor engaged in impropriety by questioning Madel, the expert witness for the defense on DNA evidence, regarding the basis for her findings. Our Supreme Court repeatedly has held that "[i]t is not . . . improper for the prosecutor to comment [on] the evidence presented at trial . . . ." (Internal quotation marks omitted.) *State* v. *Simmons*, 352 Conn. 556, 576, 337 A.3d 1097 (2025); *State* v. *Elmer G.*, 176 Conn. App. 343, 376, 170 A.3d 749 (2017) (same), aff'd, 333 Conn. 176, 214 A.3d 852 (2019); see also *State* v. *Carey*, 187 Conn. App. 438, 462, 202 A.3d 1067 (2019) ("[t]he prosecutor's statement about the defendant's credibility was permissible because the prosecutor was commenting on facts properly in evidence and reasonable inferences to be drawn from them"), aff'd, 337 Conn. 463, 254 A.3d 265 (2020). It necessarily follows that a prosecutor properly may question an expert witness about evidence presented at trial provided such questioning does not "[stray] from the evidence or [divert] the jury's attention from the facts of the case"; (internal quotation marks omitted) *State* v. *Reddick*, supra, 174 Conn. App. 564; especially when that evidence consists of a chart that was generated by the expert witness and included

the results of her DNA analysis, and nothing in the questions themselves was inflammatory.[30]

We also reject the defendant's claim that the prosecutor engaged in impropriety by using the term "profile" rather than "type" in questioning Madel about the allele table. "There is . . . a distinction between misstatement and misconduct. *State* v. *Dawes*, 122 Conn. App. 303, 314, 999 A.2d 794, cert. denied, 298 Conn. 912, 4 A.3d 834 (2010); see also *State* v. *Orellana*, [89 Conn. App. 71, 105, 872 A.2d 506] (isolated misstatement not prosecutorial impropriety) [cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005)]. . . . [W]e do not scrutinize each individual comment in a vacuum, but rather we must review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Henry B.-A.*, supra, 234 Conn. App. 221. The few instances in which the prosecutor mistakenly used the term "profile" instead of "type" do not amount to prosecutorial impropriety, especially when viewed in the context of the entire trial, in which Madel utilized the correct terminology in her answers to the prosecutor's questions. See, e.g., *State* v. *Simmons*, supra, 352

[30] As we have stated in this opinion, "[appellate courts] recognize that prosecutorial inquiries or comments that might be 'questionable' when 'read in a vacuum' often are, indeed, appropriate when 'review[ed] . . . in the context of the entire trial.' " *State* v. *O'Brien-Veader*, supra, 318 Conn. 524. In that regard, we note that, during closing argument before the jury, the prosecutor did not suggest that the defendant's DNA was present on the leggings, that Madel's testing yielded an inaccurate result, or that the jury was permitted to reach its own conclusion with respect to the DNA results. Instead, the prosecutor highlighted the potential significance of the DNA testing by arguing that the results "[did not] mean that the defendant did not touch [A's] leggings; it just means that, at the time the testing was conducted, [the defendant's] DNA was not detected on them." Defense counsel, in turn, argued to the jury that the state had "fought the DNA evidence" and that he had never before seen "a [prosecutor] try to cross-examine a DNA expert." During the prosecutor's rebuttal closing argument, the prosecutor replied that the state did not try to "explain away the DNA [results]" and that "the state didn't fight the DNA [results] . . . [but, rather] explained what touch DNA is and its limitation."

Conn. 576 n.15 ("prosecutor's imprecise language did not rise to the level of an impropriety").

Finally, the defendant's contention that "the jur[ors], equipped with the marked-up exhibit, [were] led to believe[31] they could deliberate on whether *they thought* it seem[ed] like the defendant's DNA was on the leggings despite the expert's testimony" requires little discussion.[32] (Emphasis in original; footnote added.) This claim, although framed and briefed as one of prosecutorial impropriety, is a veiled attempt to challenge the

---

[31] We note that, although the prosecutor utilized the "marked-up exhibit" during cross-examination of Madel, the prosecutor made no reference to it during closing remarks to the jury. Rather, defense counsel referred to it during his closing remarks, stating that the prosecutor had been "asking about with the yellow highlighter and the alleles; well, I just want to be clear about this, okay, [Madel] eliminated the defendant."

[32] Specifically, the defendant contends that, after offering the highlighted allele table into evidence, the prosecutor pursued cross-examination of Madel "using the highlighted exhibit to show the jury that, although Madel testified that the defendant was scientifically eliminated as even a possible contributor, a number of his alleles matched. This tended to lead the jury to disbelieve the scientific evidence and substitute its own lay judgment posing a substantial risk of distracting the jury from, and undermining confidence in, the science." In support of this claim, he relies on *State* v. *Brett B.*, 186 Conn. App. 563, 585, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019), for the proposition that it is improper for a prosecutor to state "that the defendant's DNA was found on any item from which he had been eliminated as a possible contributor to the DNA profile . . . ." In *Brett B.*, the prosecutor never made such a statement. Id. Likewise, in the present case the prosecutor never did so and, thus, the defendant's reliance on *Brett B.* is misplaced. Instead, the prosecutor in the present case utilized the highlighted allele table, which had been admitted into evidence and which admission has not been challenged on appeal, to question Madel regarding certain alleles represented in the table for the samples from the leggings that matched those on the defendant's profile. Again, as we have stated, it is not improper for a prosecutor to question an expert witness regarding the basis for the witness' opinion. Notably, any alleged suggestion by the prosecutor about those matching alleles was immediately refuted by Madel, who explained that some of those matching alleles were not unique to an individual and that only some, not all, were the same. Immediately following that colloquy, on redirect examination Madel explained further that the full DNA profile must be evaluated and stated two more times that the defendant had been eliminated as a contributor to the DNA from the leggings.

court's admission of exhibit 57A. Although defense counsel objected at trial to the court's admission of that exhibit and, after the court overruled that objection and admitted the exhibit in full, requested a mistrial, which the court denied, on appeal the defendant has not raised or briefed a distinct claim challenging the admission of exhibit 57A. See, e.g., *Goshen Mortgage, LLC* v. *Androulidakis*, 205 Conn. App. 15, 35 n.15, 257 A.3d 360 ("arguments [that] have not been advanced on appeal . . . are deemed abandoned"), cert. denied, 338 Conn. 913, 259 A.3d 653 (2021); *State* v. *Walker*, 147 Conn. App. 1, 20, 27, 82 A.3d 630 (2013) (although confrontation clause of federal constitution was basis for objection at trial, defendant did not brief or analyze any claim pertaining to confrontation clause on appeal, and, thus, this court deemed any claim concerning confrontation clause abandoned), aff'd, 319 Conn. 668, 126 A.3d 1087 (2015). Consequently, we deem any such claim pertaining to the court's admission of that exhibit abandoned, and, to the extent that the defendant's prosecutorial impropriety claim is premised on the jury's consideration of that exhibit, it fails.

Because we have concluded that the prosecutor's cross-examination of Madel was not improper, we need not address the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), for determining whether prosecutorial impropriety deprived the defendant of his due process right to a fair trial. See, e.g., *State* v. *Cusson*, 210 Conn. App. 130, 165, 269 A.3d 828, cert. denied, 343 Conn. 913, 274 A.3d 114 (2022); see also footnote 29 of this opinion.

III

The defendant's final claim is that the court violated his constitutional right to a unanimous verdict with respect to the charge of sexual assault in the fourth degree, which he alleged was duplicitous in that it

charged the defendant with having committed that offense by touching A's breast and buttocks and by having A touch his penis on multiple occasions. Specifically, he asserts that the court failed to provide the jury with a proper specific unanimity instruction, which the court had acknowledged was necessary and had promised to give, and that the specific unanimity instruction provided by the court was insufficient to cure the duplicitous nature of the sexual assault in the fourth degree charge in the operative information because "there was evidence of the same type of sexual contact occurring on multiple occasions" and the court did not instruct the jury that it had to be unanimous as to which instance of sexual contact occurred. The defendant asserts that his claim was properly preserved for appellate review as a result of the trial court having sua sponte raised the issue and told the parties that it would include a specific unanimity instruction, the state's failure to object, and defense counsel's blanket objection to the jury charge in its entirety after it was given. The defendant further asserts that the claim, nevertheless, is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[33]

The state counters that the defendant's jury instruction challenge is unpreserved and that the unpreserved claim is not reviewable under *Golding* because the defendant implicitly waived it pursuant to *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), which established a framework for review of claims of waiver

---

[33] In a footnote in his principal appellate brief, the defendant also suggests that the court's failure to provide a specific unanimity instruction as to instances of conduct warrants reversal under the plain error doctrine. See Practice Book § 60-5. We conclude that any such claim of plain error is inadequately briefed and, thus, decline to review it. The defendant devoted one short paragraph in a footnote to this issue, which is lacking in any meaningful analysis of the relevant law as applied to the facts of this case. See, e.g., *State* v. *Owens*, 235 Conn. App. 482, 484 n.2, 345 A.3d 489 (2025).

of instructional error. Alternatively, the state contends that the defendant's claim is meritless.

The following additional facts are relevant to this claim. At the end of the day on January 17, 2023, the court stated to counsel: "Now, I have sent to everybody the draft—and I underline draft—of the jury charge. If we have any ability to do the closing arguments tomorrow, we obviously need to do a jury charge. That's why I asked the jury to come in late, so that we could do that. So, this is what I ask of everybody: Take a look at what I did. It's not—it's actually not an incredibly long one, so I think we can get through it. We can email each other with different requests back and forth tonight. We will have further argument, and I am happy to change anything. This, again, is a draft. So, it's the first course of looking at these issues. I did add—and I'll send it to you separately—since the time that I sent it to you, I did add the two cautionary instructions that I gave, one relating to what would be deemed to be propensity or misconduct evidence and one relating to the grooming. If people feel that I've already given those instructions and so you don't need them highlighted, I can take them out. But I wanted to include them for purposes of everybody's consideration. You now have the jury charge. We will talk tomorrow. And we are adjourned."

The next day, January 18, 2023, the court again raised the issue of its proposed jury charge with counsel, stating, "[s]o, everybody's had an opportunity to review the draft." Defense counsel indicated that, after reading the court's proposed charge, she had only two requests, which concerned the defendant's election to testify and the adequacy of the police investigation. Thereafter, a discussion ensued between the court and counsel about those requests, after which the court mentioned that the state had "sent things last night related to the unanimity charge" and asked whether counsel had an opportunity

to review certain related case law referenced the prior day. Defense counsel stated that she had not seen a proposed charge, to which the prosecutor responded that it was part of an email that had been sent. The prosecutor indicated that his proposed charge, which the court stated it was "going to put . . . in" its charge to the jury, was based on a specific unanimity charge that had been requested by the defendant in *State* v. *Joseph V.*, 345 Conn. 516, 538 n.9, 285 A.3d 1018 (2022). The court followed by stating that it believed it was required to give a specific unanimity charge in light of *Joseph V.* and *State* v. *Douglas C.*, 345 Conn. 421, 285 A.3d 1067 (2022). Defense counsel asked whether the court would be able to send counsel a draft of the particular charge that it intended to give, and the court responded, "[a]bsolutely, but I was going to say, I don't see it as more than a standard unanimity instruction . . . that they have to be unanimous as to—but I will actually give you the exact wording."

At the end of the day on January 18, 2023, the court again discussed the proposed charge with counsel. After addressing various issues pertaining to the charge, defense counsel stated, "[a]nd the court was going to do—draft . . . [a] unanimous," to which the court responded: "It is in there. And I did, I . . . actually took a lot of [the state's] language and then when we [were] on break, I jumped into a meeting with the criminal jury instructions committee, so I'm going to actually forward that so that [you] can . . . tell me if there's something different that you think is appropriate . . . ." The court also indicated that the language it used came from the standard unanimity charge plus the language submitted by the state based on *Joseph V.*, and that defense counsel had not submitted any proposed language.

The next day, January 19, 2023, before closing arguments from counsel, the court noted that everyone had

a copy of the proposed charge "for over a day," and that it had received two additional requests. Those requests did not pertain to the unanimity charge. Following a brief discussion concerning the proposed charge, counsel made their closing remarks to the jury. The court subsequently charged the jury. With respect to the issue of unanimity as to the charge of sexual assault in the fourth degree, the court instructed: "Now, the state, as I indicated, has charged that the defendant has committed the offense of sexual assault in the fourth degree in multiple different ways, alleging that the defendant touched [A's] breast and buttocks and [had A] touch the defendant's penis. You may find the defendant guilty of the offense of sexual assault in the fourth degree only if you all unanimously agree on which of the ways the defendant committed the offense and that it occurred during the time and place charged by the state. This means you may not find the defendant guilty of sexual assault in the fourth degree unless you all agree that the state has proved beyond a reasonable doubt that [the] defendant did subject [A], who was under thirteen years of age, to sexual contact by touching [A's] breast or by touching [A's] buttocks or by having [A] touch the defendant's penis, and the defendant was more than two years older than [A]. The state charges that these crimes were committed between August, 2018, and February, [2019, at the defendant's residence].

"If the state has not met its burden of proving sexual assault in the fourth degree by way of the defendant either touching [A's] breast or touching [A's] buttocks or having [A] touch the defendant's penis, you must return a verdict of not guilty. As I've instructed you, when you reach a verdict, it must be unanimous on all elements of the offense."

After the court finished charging the jury, defense counsel made "an objection to the charge in its entirety

and every part thereof for the reasons previously stated on the record," none of which pertained to the unanimity instruction.

A

As an initial matter, we must address the state's argument that the defendant's jury instruction challenge is unpreserved and that he implicitly waived it pursuant to *Kitchens*, which thereby precludes *Golding* review.

"In *Kitchens*, [our Supreme Court] held that, 'when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal.' *State* v. *Kitchens*, supra, 299 Conn. 482–83. Under *Kitchens*, an unpreserved claim of improper jury instructions is unreviewable under the third prong of *Golding* if the claim has been implicitly waived by defense counsel. See id., 468. 'Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case.' Id., 483." *State* v. *Mebane*, 350 Conn. 483, 508–509, 325 A.3d 168 (2024).

We first must determine whether the defendant's claim is preserved. "[A] party may preserve for appeal a claim that an instruction . . . was . . . defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given. . . . Under either method [of submitting a written request to charge or taking an exception to the charge as given], some degree of specificity is required, as a general request to charge or exception will not preserve specific claims. . . . Thus, a claim

concerning an improperly delivered jury instruction will not be preserved for appellate review by a request to charge that does not address the specific component at issue . . . or by an exception that fails to articulate the basis relied upon on appeal with specificity." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilson*, 209 Conn. App. 779, 797, 267 A.3d 958 (2022). In the present case, the defendant did not file a written request to charge, and his blanket objection "to the charge in its entirety . . . for the reasons previously stated on the record," which did not concern the unanimity charge, was not sufficient to preserve his particular claim concerning the court's specific unanimity charge.[34] Accordingly, we conclude that the defendant's claim of instructional error is unpreserved.

We turn next to the issue of whether the defendant implicitly waived his unpreserved claim of instructional error under *Kitchens*. The record shows that the court provided counsel with a copy of the proposed jury instructions, allowed a meaningful opportunity for their review, and solicited comments from counsel regarding changes or modifications as to other portions of the charge, to which counsel assented. With respect to the court's specific unanimity charge, the court stated on the record that it would provide a charge consistent with *Joseph V.* and provided a copy of a proposed charge to counsel. The record before us, however, does not include a copy of the court's proposed charge; therefore, we are unable to discern whether the charge as given was the same as the language in the court's proposed charge that had been provided to counsel.

Although "the waiver rule in *Kitchens* does not require that a copy of the proposed jury instructions

---

[34] In his appellate reply brief, the defendant concedes that "defense counsel's postcharge blanket objection was [not] adequate to preserve for appeal the issue raised in [this] appeal."

be marked as an exhibit" and requires only "that the trial court gave the parties a 'copy of the proposed jury instructions' "; *State* v. *Bellamy*, 323 Conn. 400, 411, 147 A.3d 655 (2016); a "reviewing court's determination of implied waiver [must] be based on a close examination of the record and the particular facts and circumstances of each case." (Internal quotation marks omitted.) Id. "[T]he burden is on the state to secure an adequate record to support [a *Kitchens* waiver] argument." *State* v. *Ruocco*, 151 Conn. App. 732, 742, 95 A.3d 573 (2014), aff'd, 322 Conn. 796, 144 A.3d 354 (2016). " '[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights.' . . . *State* v. *Shockley*, 188 Conn. 697, 707, 453 A.2d 441 (1982), quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). '[A] waiver of a fundamental constitutional right is not to be presumed from a silent record.' *State* v. *Shockley*, supra, 707, citing *Boykin* v. *Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). For a waiver to be effective, 'it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege.' . . . *Brookhart* v. *Janis*, 384 U.S. 1, 4, 86 S. Ct. 1245, 16 L. Ed. 2d 314 (1966)." *State* v. *Rivera*, 200 Conn. App. 401, 408, 240 A.3d 303 (2020). On the basis of this record, we cannot conclude that the defendant implicitly waived his right to challenge the court's specific unanimity charge, as we cannot determine whether defense counsel was aware in advance of the alleged deficiency in the charge. See *State* v. *Brown*, 299 Conn. 640, 659, 11 A.3d 663 (2011). Accordingly, we proceed to review the defendant's unpreserved challenge to the court's specific unanimity charge pursuant to *Golding*.

B

"Under *Golding*, a defendant can prevail on a claim of constitutional magnitude not preserved at trial only

if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . [T]he inability to meet any one prong requires a determination that the defendant's claim must fail. . . . The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wright*, 235 Conn. App. 143, 161, 345 A.3d 504 (2025). In the present case, the record contains a transcript of the court's specific unanimity charge to the jury, and the defendant's claim is of constitutional magnitude. See, e.g., *State* v. *Edwin B.*, 231 Conn. App. 702, 713–14, 334 A.3d 1064 (defendant has right to jury unanimity under sixth amendment to federal constitution), cert. granted, 352 Conn. 905, 335 A.3d 846 (2025). We, therefore, examine whether the defendant has established a violation of that constitutional right that deprived him of a fair trial.

The following legal principles are relevant to our analysis of the defendant's claim that the court's specific unanimity instruction concerning the charge of sexual assault in the fourth degree was insufficient to cure the duplicitous nature of that charge in count one of the operative information. "It is beyond dispute that the jury verdict in a criminal trial must be unanimous. See, e.g., *Ramos* v. *Louisiana*, 590 U.S. 83, 92, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020); see also id., 93 (jury unanimity applies to states via fourteenth amendment). The constitution ensures that a jury 'cannot convict unless it unanimously finds that the [g]overnment has

proved each *element*' of the charged crime. . . . *Richardson* v. *United States*, 526 U.S. 813, 817, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999). Although a general instruction that the verdict must be unanimous will often suffice, a specific unanimity instruction can be required when, for example, an information is duplicitous. [Our Supreme Court] recently explained that an information is duplicitous when it combines two or more offenses in one count and may raise unanimity concerns that generally fall into two categories: unanimity as to elements and unanimity as to instances of conduct. *State* v. *Douglas C.*, supra, 345 Conn. 425 n.1; *State* v. *Joseph V.*, [supra, 345 Conn. 530–31].'' (Emphasis in original.) *State* v. *Inzitari*, 351 Conn. 86, 108–109, 329 A.3d 215, cert. denied,     U.S.    , 145 S. Ct. 2787,     L. Ed. 2d     (2025).

Specifically, in *Douglas C.*, which was released on the same day as *Joseph V.*, our Supreme Court stated: ''[C]ourts have explained that this first kind of unanimity claim involves the question of 'when is a disputed fact—e.g., whether the crime occurred on a Monday or a Tuesday, with a knife or a gun, against this or that victim—one that the jury must unanimously agree [on], and when is it merely dispensable detail [i.e., element vs. means]? And the second [involves the question]: when is a defendant's conduct one violation of a statute, and when is it many?' '' *State* v. *Douglas C.*, supra, 345 Conn. 440. The court further explained: ''[A] claim of unanimity as to elements implicates different concerns than a claim of unanimity as to instances of conduct. Specifically, for claims of unanimity as to elements, unanimity concerns arise from the statutory language or scheme at issue. . . . The concern . . . is whether the statutory language creates multiple elements, each of which the government must charge as a separate offense, or alternative means of committing an element. In contrast, for claims of unanimity as to instances,

unanimity concerns arise from the evidence of the defendant's conduct, viewed in light of the statutory language. In the latter situation, there is no dispute over whether the defendant violated multiple subsections of a statute, each of which constitutes a separate offense; rather, the dispute is over whether the defendant may be convicted of a single count of violating a statute based on evidence of multiple, separate occurrences of the prohibited act or acts. See *United States* v. *Correa-Ventura*, 6 F.3d 1070, 1080 (5th Cir. 1993) (discussing difference between unanimity as to elements cases and unanimity as to instances cases). For example, a claim of unanimity as to instances of conduct may arise in a case in which the defendant is charged with a single count of assault but there was evidence presented to the jury that the defendant assaulted the victim three separate times on three separate dates. In such a case, the concern arises that the jury may have agreed that the defendant committed assault but may not have agreed which assault the defendant committed. Because of the distinct nature of these two unanimity claims, federal courts have applied a different test to claims of unanimity as to elements than to claims of unanimity as to instances." (Citation omitted.) *State* v. *Douglas C.*, supra, 441.

In *Douglas C.*, our Supreme Court adopted the "federal test for claims of unanimity as to instances of conduct." Id., 463. Pursuant thereto, a defendant is entitled to a specific unanimity charge as to instances of conduct under the following three-pronged test: "(1) Considering the allegations in the information and the evidence admitted at trial, does a single count charge the defendant with violating a single statute in multiple, separate instances? (2) If so, then does each instance of conduct establish a separate violation of the statute? If the statute contemplates criminalizing a continuing course of conduct, then each instance of conduct is

not a separate violation of the statute but a single, continuing violation. To determine whether the statute contemplates criminalizing a continuing course of conduct, we employ our well established principles of statutory interpretation. Only if each instance of conduct constitutes a separate violation of the statute is a count duplicitous. And (3) if duplicitous, was the duplicity cured by a bill of particulars or a specific unanimity instruction? If yes, then there is no unanimity issue. If not, then a duplicitous count violates a defendant's right to jury unanimity but reversal of the defendant's conviction is required only if the defendant establishes prejudice." Id., 448.

Because a jury unanimity "claim is premised on an alleged infringement of the defendant's constitutional rights, [appellate] review is plenary." Id., 435. "[A] single count is not duplicitous merely because it contains several allegations that could have been stated as separate offenses. . . . Rather, such a count is . . . duplicitous [only when] the policy considerations underlying the doctrine are implicated. . . . These [considerations] include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution. . . . A duplicitous information [implicating a defendant's right to jury unanimity], however, may be cured either by a bill of particulars or a specific unanimity instruction." (Internal quotation marks omitted.) *State* v. *Joseph V.*, supra, 345 Conn. 529.

In the present case, the court provided the jury with a specific unanimity instruction that required the jury to be unanimous as to which of the three types of ways the defendant was alleged to have committed the

offense. The court instructed that, in light of the language of count one charging the defendant with having committed "sexual assault in the fourth degree in multiple different ways . . . [the jurors could] find the defendant guilty of th[at] offense . . . if [they] all unanimously agree[d] on which of the ways the defendant committed the offense and that it occurred during the time and place charged by the state." This meant that the jurors could "not find the defendant guilty of sexual assault in the fourth degree unless [they] all agree[d] that the state ha[d] proved beyond a reasonable doubt that [the] defendant did subject [A], who was under thirteen years of age, to sexual contact by touching [A's] breast or by touching [A's] buttocks or by having [A] touch the defendant's penis, and the defendant was more than two years older than [A]." As is evident from the court's instruction, the court did not instruct the jury that it had to be unanimous as to which instance or instances of conduct, if any, it found the defendant to have committed.

With this background in mind, we now address the merits of the defendant's claim. Pursuant to the test set forth in *Douglas C.*, we first must determine whether count one of the operative information is duplicitous, an issue the parties do not dispute. Count one charged the defendant with having committed sexual assault in the fourth degree, in violation of § 53a-73a (a) (1) (A), "on or about August, 2018, through February of 2019," by subjecting A to sexual contact, namely, by touching A's breasts and buttocks and by having A touch his penis, and there was testimony at trial, at least in part, as to specific instances of sexual contact. Similar to the information in *Joseph V.*, which charged that the defendant committed sexual assault in the first degree "on or about diverse dates between August 23, 2006, and December 25, 2010"; *State* v. *Joseph V.*, supra, 345 Conn. 539; the operative information in the present case

charges the defendant with having violated a single statute in multiple instances, each of which would constitute a violation of the statute. See id., 551; see also, e.g., *State* v. *Velasquez-Mattos*, 347 Conn. 817, 846 and n.11, 300 A.3d 583 (2023) (parties did not dispute that information charging defendant with sexual assault in first degree on "diverse dates between August, 2014, [through] October, 2014," was duplicitous in that it was premised on multiple acts, each of which would have been separate violation of statute (internal quotation marks omitted)).

With respect to the second step of the *Douglas C.* test, the defendant contends that the sexual assault statutes criminalize separate acts, as opposed to the risk of injury statute, which criminalizes an ongoing course of conduct. See *State* v. *Douglas C.*, supra, 345 Conn. 469. The state does not oppose this contention and makes no assertion that § 53a-73a (a) (1) (A)—the statute governing sexual assault in the fourth degree—criminalizes a continuing course of conduct such that "each instance of conduct is not a separate violation of the statute but a single, continuing violation." Id., 448. Although our Supreme Court, in *Joseph V.*, determined that the statute governing sexual assault in the first degree—General Statutes § 53a-70 (a) (2)—criminalizes separate acts of sexual intercourse, in *Douglas C.*, decided the same day as *Joseph V.*, the court noted, in addressing a statutory revision to the risk of injury statute, that, at the time of that revision, "our case law was clear that *sexual assault* is a single act crime, not a continuous course of conduct crime." (Emphasis added.) Id., 460 n.22; see also *State* v. *Cody M.*, 337 Conn. 92, 101, 259 A.3d 576 (2020) ("sexual assault . . . is a separate act crime"). These broader statements of the court in *Douglas C.* and *Cody M.* regarding the crime of sexual assault in general, along with *Joseph V.*, support a conclusion that sexual assault in the fourth

degree is a single act crime and not a continuous course of conduct crime.[35]

Accordingly, because the first two steps of the test set forth in *Douglas C.* have been satisfied, we proceed to the third step. Pursuant to step three of that test, we must determine whether the duplicity was "cured by a bill of particulars or a specific unanimity instruction . . . . If yes, then there is no unanimity issue. If not, then a duplicitous count violates a defendant's right to jury unanimity but reversal of the defendant's conviction is required only if the defendant establishes prejudice." *State* v. *Douglas C.*, supra, 345 Conn. 448. Furthermore, it is important to note that, in *Douglas C.*, our Supreme Court specifically rejected the defendant's argument "that a trial court's failure to give a specific unanimity instruction when a single count is premised

---

[35] Nonetheless, we note that the court in *Joseph V.* based its conclusion on the plain language of the sexual assault in the first degree statute, which requires the state to establish that the defendant "engage[d] in sexual intercourse"; General Statutes § 53a-70 (a) (2); when considered in relation to the definition of sexual intercourse. See General Statutes § 53a-65 (2) ("'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Penetration however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio . . . ."); and found that the statutory language and definition "suggest[ed] that the statute intended to criminalize each single act of sexual intercourse, [as it] is defined in singular terms." *State* v. *Joseph V.*, supra, 345 Conn. 544. In comparison, a person is guilty of sexual assault in the fourth degree when such person "subjects another person to sexual contact"; General Statutes § 53a-73a (a) (1); which is defined in part as "*any contact* with the intimate parts of a person for the purpose of sexual gratification of the actor . . . ." (Emphasis added.) General Statutes § 53a-65 (3) (A). The verb "subject" is defined in part as "to cause or force to undergo or endure (something unpleasant . . .)." Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 1243. That definition does not provide clarification on the issue of whether the statute criminalizes a course of conduct, and the word "subjects," like the term "engages" in *Joseph V.*, could be suggestive of ongoing conduct. Similar to *Joseph V.*, however, when the word "subjects" is considered in context with the definition of "sexual contact," which is also defined in singular terms as "any contact," it suggests a legislative intent to criminalize single acts of sexual contact.

on multiple, separate instances of conduct constitutes structural error,[36] regardless of prejudice to the defendant." (Footnote added.) Id., 447 n.16. In doing so, our Supreme Court determined that the defendant's position "conflicts with the test established by the federal courts of appeals for constitutional claims" and that "our appellate courts have never applied structural error to unanimity claims." Id.

In the present case, the defendant never requested a bill of particulars and takes issue with the specific unanimity instruction provided by the court, arguing that "the court's charge informed the jury that it must be unanimous as to each of the elements of the crime of sexual assault in the fourth degree . . . . It also informed the jury that it must unanimously agree on which of the ways the defendant committed the offense and that it occurred during the time and place charged by the state. . . . The court did not ever inform the jury that it must also . . . agree on which incident or incidents it was basing its verdict, even though the state presented evidence of at least seven separate incidents falling with[in] the time and place description in count one." (Citations omitted; internal quotation marks omitted.) Thus, the defendant contends that the court's instruction did not conform to the requirements of *Joseph V.*, thereby warranting a new trial on that count.

There is no question that the court did not give the jury a specific unanimity instruction regarding instances

---

[36] "Structural errors are those which 'by their very nature cast so much doubt on the fairness of the trial process that, as a matter of law, they can never be considered harmless. . . . These are structural defects in the constitution of the trial mechanism, which defy analysis by [harmless error] standards. . . . Instead, structural errors require reversal of the defendant's conviction and a new trial. . . . Constitutional violations have been found to be structural, and thus subject to automatic reversal, only in a very limited class of cases.' . . . *State* v. *Joseph A.*, 336 Conn. 247, 264–65, 245 A.3d 785 (2020)." *State* v. *Christopher R.*, 222 Conn. App. 763, 784 n.10, 306 A.3d 1117 (2023), cert. denied, 348 Conn. 946, 308 A.3d 34 (2024).

of conduct and, therefore, we must determine whether "the defendant establishe[d] prejudice"; that is, whether "the duplicity created the genuine possibility that the conviction resulted from different jurors concluding that the defendant committed different acts." *State* v. *Douglas C.*, supra, 345 Conn. 447. For the following reasons, we conclude that, under the circumstances of this case and applying the test set forth by our Supreme Court in *Douglas C.*, the defendant has not demonstrated that he was prejudiced by the court's failure to provide the jury with a specific unanimity instruction as to instances of conduct.[37] See *State* v. *Velasquez-Mattos*, supra, 347 Conn. 851 ("[w]hether the defendant's duplicity claim requires reversal depends on whether the lack of a specific unanimity charge or bill of particulars ultimately prejudiced him").

We begin our analysis with a discussion of *Joseph V.* In *Joseph V.*, "the victim testified about three distinct incidents of abuse by the defendant," and another witness "testified about an additional distinct incident of abuse of the victim by the defendant during which [the witness] was present but did not participate." *State* v. *Joseph V.*, supra, 345 Conn. 525. Thus, the jury had before it testimony regarding "four specific, separate incidents of conduct" by the defendant. Id., 534. On appeal, the defendant argued that, "because the trial court did not provide the jury with a specific unanimity instruction,[38] the jury verdict violated his right to jury

---

[37] Because we are reviewing this claim pursuant to *Golding*, for the defendant to establish the third *Golding* prong—the existence of a constitutional violation that deprived him of a fair trial—he must establish the three part test set forth in *Douglas C.* See *State* v. *Velasquez-Mattos*, supra, 347 Conn. 857 ("because the defendant was not prejudiced by the uncured violation of his right to jury unanimity as to instances of conduct, there was no constitutional violation, and the defendant is not entitled to a new trial").

[38] Instead, the court provided the jury with a general instruction regarding unanimity, which provided in part that "[i]n order to convict the defendant on this count you must be *unanimous that at least one violation of this statute by one of the methods alleged occurred* between the defendant and

unanimity and created the possibility that the jury found him guilty without having agreed on which instance of conduct he committed." Id., 538–39. Our Supreme Court agreed with the defendant and determined that he suffered prejudice as a result of the violation, thereby warranting a new trial on the count of sexual assault in the first degree. In particular, the court stated: "Because we hold that a single count of sexual assault premised on specific testimony of multiple separate acts, committed other than in the course of a single criminal episode of relatively brief, temporal duration, is duplicitous and violates a defendant's right to jury unanimity when no specific unanimity instruction is given, we must determine whether this duplicity prejudiced the defendant. In light of the evidence of multiple, separate instances of sexual intercourse, we conclude that the jury reasonably could have interpreted the trial court's instruction that it 'must be unanimous that at least one violation of this statute by one of the methods alleged occurred between the defendant and [the victim] during the time frame indicated' to require it to be unanimous as to whether *an* instance of sexual intercourse occurred but not to require it to be unanimous as to *which* instance of sexual intercourse occurred. *This is especially so in light of the specific nature of the testimony* and defense counsel's extensive cross-examination and closing argument directed at *unique credibility concerns related to each incident, as well as the prosecutor's closing argument that any of the alleged incidents would establish the element of sexual intercourse.* . . . The duplicitous nature of count one created the potential for the jury to be confused or to disagree about which of the various acts of sexual intercourse the defendant committed, thereby prejudicing him." (Emphasis altered; footnote omitted.) Id., 556–57.

[the victim] during the time frame indicated." (Emphasis in original; internal quotation marks omitted.) *State* v. *Joseph V.*, supra, 345 Conn. 540.

In *Joseph V.*, our Supreme Court noted that "this state's case law regarding unanimity and ongoing sexual assault of children has created some confusion on this issue," partly in light of "an understandable motivation to accommodate the difficulties inherent in prosecuting such cases involving children, particularly traumatized children." Id., 552. Although the court made that statement in the context of addressing whether it has ever recognized a common-law exception for a continuing course of sexual assault, we find informative to the issue of harm in the present case the court's discussion of case law that distinguishes "between sexual assault cases in which there is specific testimony regarding multiple, separate incidents of sexual assault, and cases in which there is only general testimony that multiple incidents of sexual assault occurred but precise details regarding time and location are unknown," which "occurs commonly in cases involving the ongoing sexual assault of children." Id. As the court explained, these cases have "caused confusion in the Appellate Court . . . over whether an information is duplicitous or whether any duplicity creates a risk of a nonunanimous verdict when a sexual assault case involves only general testimony about multiple incidents of sexual assault." Id. The court held that, "[t]o the extent the defendant relies on this case law to argue that the Appellate Court has held that a single count of sexual assault, premised on specific testimony of multiple, separate incidents of conduct may be alleged under a continuing course of conduct theory, we disagree. Rather, these cases show that, when there is only general testimony regarding the ongoing sexual assault of a child, a defendant more likely than not will not be prejudiced by a single count of sexual assault premised on multiple incidents of conduct." Id., 552–53.

In explaining its determination, the court stated: "This issue first arose in *State* v. *Saraceno*, 15 Conn.

App. 222, 229, 545 A.2d 1116, cert. denied, 209 Conn. 823, 552 A.2d 431 (1988), and cert. denied, 209 Conn. 824, 552 A.2d 432 (1988), in which the defendant claimed that the information was duplicitous because the two counts of sexual assault of which he was convicted each alleged the commission of a single crime based on multiple, separate incidents of sexual intercourse. Id., 227–28. In resolving this claim, the court addressed the five policy considerations underlying the doctrine of duplicity. See id., 229–32. As to the possible lack of jury unanimity, the Appellate Court concluded 'that with regard to the evidence adduced . . . it was not possible for the jury to return a verdict [that] was not unanimous. Given the complainant's age and her relative inability to recall with specificity the details of separate assaults, the jury was not presented with the type of detail laden evidence [that] would engender differences of opinion on fragments of her testimony. In other words, the bulk of the state's case rested on the credibility of the young complainant. When she testified . . . that on many occasions the defendant forced her to engage in fellatio while in a motor vehicle parked on the banks of the Connecticut River, the jury was left, primarily, only with the decision of whether she should be believed. With such general testimony, the spectre of lack of unanimity cannot arise. . . . Under the specific circumstances . . . [the court] conclude[d] that the defendant was not prejudiced by the potential lack of jury unanimity.' Id., 230–31.

"In so holding, the court clearly focused on whether the defendant was prejudiced by the potential lack of unanimity, specifically, whether the jury possibly was confused. See id., 229–31. The court concluded that, in light of the nature of the general testimony, there was no possibility that the jury had a difference of opinion as to which acts the defendant had committed because the nature of the testimony did not allow the jury to

be divided as to which instance of conduct occurred but, rather, required the jury to credit all or none of the victim's testimony. See id., 230. In other words, the court determined that any potential duplicity, assuming it existed, was not harmful. *Saraceno* did not hold that a single count of sexual assault premised on specific testimony of multiple separate instances of conduct may be alleged under a continuing course of conduct theory. Thus, under neither the statutory scheme at issue nor our state's common law may first degree sexual assault be charged as a continuing course of conduct crime when premised on specific testimony of multiple, separate incidents of conduct."[39] *State* v. *Joseph V.*, supra, 345 Conn. 553–54.

[39] In a footnote, the court stated further: "We are sympathetic to the plight of both the young victims, often unable to state except in the most general terms when the acts were committed, and of prosecutors, either hampered by the lack of specific information or, when it is reported that the conduct occurred dozens or hundreds of times over a significant period, faced with the practical problem of how to deal with such a multitude of offenses. . . . Sympathies aside, however, we have only the words of our sexual assault statute to interpret and apply to the federal case law.

"We note the observation of *Saraceno* and its progeny that a defendant is not prejudiced when a single count of sexual assault is premised on only general testimony that the defendant continuously sexually assaulted the minor victim over a period of time if this general testimony did not allow the jury to be divided as to which instance of conduct occurred but, rather, required the jury to credit all or none of the victim's testimony. This is consistent with how other state courts have treated general testimony regarding multiple instances of sexual assault of a child when applying federal law [in connection with a claim involving jury unanimity]. See *State* v. *Voyles*, 284 Kan. 239, 253–55, 160 P.3d 794 (2007) (considering general nature of victims' testimony and general nature of defendant's defense challenging victims' credibility in determining harm of duplicitous indictment in multiple acts case); *State* v. *Ashkins*, 357 Or. 642, 654, 357 P.3d 490 (2015) (in addressing harm, explaining that, in the context of nonspecific and undifferentiated evidence of multiple occurrences of a single charged offense, a jury concurrence instruction may have been unnecessary because there would have been no basis for the jurors to choose any particular occurrence as the one proven); *State* v. *Fitzgerald*, Docket No. 38347-7-I, 1997 WL 327421, *2 (Wn. App. June 16, 1997) (decision without published opinion, 86 Wn. App. 1059) (in multiple acts case in which defendant entered only general denial and proof of crime was solely dependent on victim's credibility

Following *Joseph V.*, our Supreme Court again addressed a specific unanimity claim and whether the defendant in that case was prejudiced by the lack of a specific unanimity instruction as to instances of conduct in *State* v. *Velasquez-Mattos*, supra, 347 Conn. 817. Although the present case differs slightly from *Velasquez-Mattos*, we find the court's analysis of harm therein to be instructive. A brief discussion of that case will be helpful to our analysis. The defendant lived in the first floor apartment of a multifamily house. Id., 823. An eight year old boy, J, and J's family lived in the second floor apartment. Id. "The defendant befriended then eight year old J and purchased various gifts for him, including clothes, video games, and a PlayStation 4 gaming console. Almost nightly, the defendant invited J downstairs to do homework and play video games in the defendant's bedroom, locking the bedroom door each time. During these visits in the locked bedroom, the defendant touched J's and his own penis and anally penetrated J with his penis." Id., 823–24. The defendant subsequently was arrested and "charged with, 'on or about diverse dates between August, 2014, [through] October, 2014,' " one count of sexual assault in the first degree, and two counts of risk of injury to a child. Id., 824. The case was tried to a jury, which found the defendant guilty on all three counts. Id., 825. On appeal, the defendant claimed, inter alia, that the sexual assault charge was duplicitous, in violation of his right to jury unanimity, and that, under *State* v. *Douglas C.*, supra,

versus that of defendant, court's failure to give jury unanimity instruction may be harmless when rational trier of fact would have no reasonable doubt about other indistinguishable incidents).

"The state may argue that, if these kind of general testimony cases do not prejudice a defendant, it might be that there exists a common-law exception to the right to jury unanimity for a continuing course of conduct of sexual assault of children when there is only general testimony. Because the state has not raised this issue, however, and because the present case does not involve only general testimony, we do not address it." (Internal quotation marks omitted.) *State* v. *Joseph V.*, supra, 345 Conn. 554–55 n.20.

345 Conn. 421, and *State* v. *Joseph V.*, supra, 345 Conn. 516, the trial court's failure to provide a specific unanimity instruction required reversal of his sexual assault conviction because "the duplicity violation created a genuine possibility that the conviction occurred as a result of different jurors concluding that the defendant committed different acts, thereby prejudicing him." *State* v. *Velasquez-Mattos*, supra, 843. The defendant also contended that his case was "not one in which the duplicitous count was based only on general testimony that the jury would either credit or discredit in its entirety because J testified about at least three specific incidents that took place over the course of three months." Id.

In addressing the issue of whether the lack of a specific unanimity charge prejudiced the defendant, our Supreme Court stated: "The record demonstrates that the prosecutor explored multiple instances of sexual conduct during the state's case-in-chief. J testified in detail as to the 'first time' that the defendant touched him inappropriately, and J subsequently testified that the defendant had touched him or asked him to touch the defendant approximately four to six times. J also testified in detail as to an occasion when he was 'in [the defendant's] bedroom and something happened with [J's] behind . . . .' J stated that 'the thing with [his] butt happen[ed]' approximately five times. On cross-examination, defense counsel asked J whether 'the thing with [his] butt happen[ed] on the Wednesday or Thursday before that Monday—before the weekend,' and J responded that 'it was on the Thursday.' On redirect examination, the prosecutor clarified that the Thursday to which defense counsel was referring was October 2, 2014, and, during closing argument, the prosecutor explained to the jury the legal definition of 'sexual intercourse.'

"During closing argument, defense counsel drew attention to accounts of the incident from [J and two other witnesses] with respect to 'October 2, which [was] a Thursday . . . .' He also observed that '[w]e have a case alleging sexual assault with sexual intercourse, anal penetration . . . .' He continued: 'Now, you [have] heard [J] testify that he was raped multiple times; he couldn't tell you how many. Sometimes it was three, sometimes it was five, sometimes it was six, sometimes it was every day.' The trial court then instructed the jury that, to find the defendant guilty of sexual assault in the first degree, the state had to prove that the defendant had engaged in sexual intercourse, meaning 'vaginal intercourse, anal intercourse, fellatio, or cunnilingus.' " (Footnotes omitted.) Id., 851–52.

Our Supreme Court started its analysis with a discussion of *Joseph V.*, after which it noted that, "[a]lthough *Joseph V.* is the only decision applying the test articulated in *Douglas C.*, the Appellate Court's previous decision in *State* v. *Saraceno*, [supra, 15 Conn. App. 222], is also instructive. See *State* v. *Joseph V.*, supra, 345 Conn. 553–56." *State* v. *Velasquez-Mattos*, supra, 347 Conn. 854. The court proceeded to discuss the basis for this court's decision in *Saraceno*, and then it stated: "Although the defendant in the present case contends that J testified to at least three specific, discrete incidents that took place over the course of several months, our review of the record reveals that J testified to two specific instances of conduct as examples of the reoccurring sexual activity—the first being the 'first time' and the second being when 'something happened with [J's] behind'—with only the latter instance containing allegations of sexual intercourse within the meaning of the sexual assault statute. . . . J testified that the 'first time' that the defendant had been inappropriate with him was when the defendant touched J's penis and forced J to touch the defendant's penis for about ten

seconds. . . . J then testified about, and both the prosecutor and defense counsel focused their examinations on throughout the trial, the October 2, 2014 incident, when the defendant anally penetrated J's 'behind.' . . . Specifically, on cross-examination, defense counsel asked J about 'the *one that happened on Thursday,*' and, on redirect examination, the prosecutor clarified that the Thursday that defense counsel was referring to was October 2, 2014. . . .

"Beyond the evidence focusing on the sexual assault allegations on Thursday, October 2, 2014, at trial, the defendant . . . advanced essentially the same defense that the defendant advanced in *Joseph V.*, namely, that the victim and witness or witnesses lacked credibility. See *State* v. *Joseph V.*, supra, 345 Conn. 539. However, unlike in the present case, defense counsel in *Joseph V.* 'extensive[ly]' cross-examined the victim and the witness regarding the specifics of *each of the three particular incidents* of conduct, argued in closing the unique credibility concerns relating to *each incident*, and attacked the prosecutor's closing argument that *any* of the alleged incidents would establish the element of sexual intercourse. See id., 556–57 and n.21; see also id., 557 n.21 ('[t]he primary focus of the trial was on these specific incidents of conduct'). . . .

"Although neither the information nor the jury charge indicated which instance of sexual intercourse the first degree sexual assault charge was based on, the prosecutor specified during closing argument that the state was relying on the October 2, 2014 incident as the basis for that charge, and the prosecutor's direct examination of [J and other witnesses] was consistent with that approach. During closing argument, defense counsel also attacked the testimony of [J and two other witnesses] regarding the October 2, 2014 incident, while maintaining that J had fabricated the abuse entirely.

Thus, the risk of prejudice to the defendant was minimized when . . . the defendant utilized the same theory of defense for both the single specific incident alleged and the general conduct alleged, namely, that the sexual abuse never happened and that it was entirely fabricated. Put differently, there was no realistic possibility of juror confusion or disagreement concerning the multiple incidents because the jurors were required either to find that the allegations were fabricated and that no sexual conduct ever occurred at all, or to believe J's testimony, as corroborated by the other witnesses, that anal penetration had in fact occurred on October 2, 2014. Compare *State* v. *Hufford*, 205 Conn. 386, 397, 533 A.2d 866 (1987) (there was no prejudice when defense was simple denial that incident had ever occurred, and defendant did not assert that he would have changed his defense if information had charged him with each alternative in separate counts or in conjunctive), with *Jackson* v. *State*, 342 P.3d 1254, 1256, 1258–59 (Alaska App. 2014) (prejudice existed because defense clearly differentiated between vaginal and anal penetration, asserting that one was consensual and one was accidental), and *State* v. *Trujillo*, 296 Kan. 625, 630, 294 P.3d 281 (2013) ('cases not containing a unified defense are reversed' . . .). Likewise, J was only ten years old when he testified and approximately eight or nine years old when the abuse took place. See *State* v. *Saraceno*, supra, 15 Conn. App. 230 (relying on victim's age and 'relative inability to recall with specificity the details of separate assaults' in upholding conviction)." (Citations omitted; emphasis in original.) *State* v. *Velasquez-Mattos*, supra, 347 Conn. 855–57.

In the present case, our review of the record demonstrates that A provided testimony that was, in part, general in nature,[40] describing sexual abuse that occurred

---

[40] For example, A testified regarding a course of sexual assault that started in August, 2018, and escalated thereafter, continuing into February, 2019. A testified that most of the sexual assaults took place while she and the

on an ongoing basis, almost every time that she went to the defendant's home, and, in part, provided details as to instances of sexual contact that occurred between A and the defendant in different locations of the defendant's home, at different time periods, as examples of the type of sexual abuse that had taken place.[41] Of those

defendant were watching movies, either in his basement or living room, during which times he would wrap his arms around her, cuddle her, kiss her and touch her breasts over her clothes. There were times when the defendant would touch A's breasts under her clothes but over her bra, and when he touched her vaginal area under her clothes but over her underwear, and moved his hand back and forth. A further testified that the defendant would wear loose pajama pants with no underwear to make "his penis more accessible," and he would put A's hand on his penis and make her move it up and down, and that this would happen "every time" that A went to the defendant's house, which was approximately three times per week every week from August to February.

[41] In his principal appellate brief, the defendant alleges that "the state presented evidence of at least seven separate incidents falling [within] the time and place description in count one," and that "there was great potential for the jury to be confused as to the multiple types of unanimity required and to disagree about which of the various alleged incidents the defendant committed." He lists those incidents as follows: (1) "August 2 or 3, 2018. Bedroom. [A] got on the bed and the defendant got on top of her while both were clothed, pushing his genitals back and forth against hers. The defendant also felt A's breast through her clothes"; (2) " 'Towards the winter season.' Living room. [A] was on top of the defendant and they were 'cuddling' on the couch. The defendant was moving [A's] hips back and forth on him with her vagina over his penis. The defendant got up and ran to the bathroom, and [A] felt wetness on her leggings. She later gave those leggings to the police"; (3) "Around Halloween. 2018. Living room. [A] testified she touched the defendant's penis, but was inconsistent as to whether the touching was through his clothes. In her initial description, she stated that she remembered 'looking and his penis was out and I remember looking behind me and seeing the—the Halloween lights.' . . . Shortly thereafter, [A] stated that she touched the defendant's penis on this occasion 'over the clothes,' as opposed to 'under the clothes' "; (citation omitted); (4) "November 29, 2018. Living room. [A] went to the defendant's house to watch 'How the Grinch Stole Christmas.' The defendant put his hands in her pants and rubbed her vagina through her underwear. Afterwards, the defendant said, 'good girl,' and she 'burrowed' her head in his shoulder"; (5) "Date unspecified. Kitchen. The defendant stood against the counter with his legs spread a bit. [A] stood against the defendant, who grabbed her hips and pushed her into him. The defendant said, 'You drive me nuts' "; (6) Date unspecified. Attic stairs. The defendant hit [A's] 'ass' and told her to 'get [her] cute ass

incidents to which A testified, we conclude that only two involve the type of sexual contact alleged in the operative information regarding the charge of sexual assault in the fourth degree—touching A's breasts and buttocks and A touching the defendant's penis—and are sufficiently distinguishable from A's general testimony to be regarded as specific, separate instances of conduct, "each of which could independently establish a violation of the charged statute."[42] *State* v. *Douglas C.*, supra, 345 Conn. 426. Those two separate instances include the following: (1) A's testimony about the first time that she went into the defendant's bedroom, which took place on August 2 or 3 and in which the defendant touched A's breasts; and (2) A's testimony about the first time that she touched the defendant's penis, which occurred on the couch in the living room around the time of Halloween. Furthermore, during A's forensic interview, a transcript and video recording of which was

downstairs' "; and (7) "Date unspecified. Basement. The defendant hugged [A], rubbed up against her, and held her."

Although we do not agree that all of these separate instances fall within the type of sexual contact that forms the basis for the sexual assault in the fourth degree charge in count one, we do, for the reasons stated in this opinion, agree that there was testimony about separate instances of sexual contact pertaining to count one.

[42] In making this determination, we also are mindful that sexual assault in the fourth degree is a specific intent crime that requires a specific intent to obtain sexual gratification. See, e.g., *State* v. *Vickers*, 228 Conn. App. 830, 846–47, 326 A.3d 287, cert. denied, 350 Conn. 930, 326 A.3d 556 (2024). For that reason, we do not believe that A's testimony about how, when she and the defendant were on the attic stairs one time, the defendant hit A's "ass" and said, "get [your] cute ass downstairs," falls within the type of incident that could independently establish a violation of the statute. Likewise, A's general testimony that, every time they were in the defendant's living room, they would cuddle on the couch and he would touch her breasts and "butt" is not sufficiently detailed or specific to be distinguishable as a separate incident for purposes of a specific unanimity claim, despite the fact that it could support a finding of the type of sexual contact necessary for a conviction of the charge. Nevertheless, even if we were to construe the attic incident as a fourth, separate instance of conduct that was before the jury, that would not alter our conclusion regarding prejudice under the circumstances of this case.

admitted into evidence, A described a specific incident occurring in February, 2019, one of the last times she went to the defendant's home, in which the defendant was being "extra, extra creepy" and made her touch his penis on the couch and grabbed her "butt" and breasts. Even though there was testimony and other evidence regarding three specific instances of conduct and the court's specific unanimity charge did not reference instances of conduct, that does not, by itself, require a new trial. See *State* v. *Douglas C.*, supra, 345 Conn. 447 n.16. In both *Joseph V.* and *Velasquez-Mattos*, our Supreme Court, in determining whether prejudice was established, considered other factors, including the primary focus of the trial, the theory of defense advanced by the defendant, the extent of defense counsel's cross-examination regarding the specific instances, and the closing arguments of both the prosecutor and defense counsel. See *State* v. *Velasquez-Mattos*, supra, 347 Conn. 855–57.

On the issue of prejudice, the circumstances of the present case are, in large part, distinguishable from *Joseph V.* In finding prejudice in *Joseph V.*, our Supreme Court noted that defense counsel " 'extensive[ly]' cross-examined the victim and the witness regarding the specifics of *each of the three particular incidents* of conduct [described by the victim], argued in closing the unique credibility concerns relating to *each incident*, and attacked the prosecutor's closing argument that *any* of the alleged incidents would establish the element of sexual intercourse." (Emphasis in original.) Id., 855–56. In contrast, in the present case, defense counsel did not cross-examine A with respect to any alleged "instances" of sexual abuse, let alone the details of any of the alleged incidents, or with respect to any of A's general testimony concerning the ongoing sexual abuse that took place at the defendant's house. Instead, the bulk of defense counsel's cross-examination focused

on the text messages between A and the defendant and how those messages came to be in the possession of the police, and it covered other topics such as, inter alia, the arrangement whereby A would go to the defendant's house when her mother was at work, A's forensic interview, and photographs of A on her Instagram account. For the most part, defense counsel sought to challenge A's credibility by, for example, cross-examining her about statements she had made during her forensic interview that were untrue. At one point, defense counsel asked A whether, during her forensic interview, she told Nichols that she had sat on top of the defendant, that the defendant moved his hips back and forth, and that A thought that the defendant's bodily fluids might be on her leggings. Apart from that general reference, which does not relate to the three specific instances at issue with count one, no other questions on cross-examination were directed toward A's testimony about the instances of sexual contact.

Defense counsel's closing argument was equally devoid of references to any specific instances of sexual assault by the defendant. Rather, in a closing argument that spanned more than thirty pages of transcript, defense counsel made one brief reference to the substance of A's testimony about the sexual abuse, stating: "The trial . . . is two days, three days a week we're cuddling, he's humping me, he's on top of me, I'm sitting on his lap, he's moving my hips back and forth, he's getting excited, he's got to run to the bathroom a few times. This is what's going on, I'm touching his—his personal anatomy, I'm touching his penis, I'm rubbing it the way, whatever, okay." Instead of criticizing or discrediting any of the alleged specific instances of sexual contact, defense counsel sought to discredit A's testimony in its entirety, stating, "I don't know this kid, I don't know what's inside of her head. I know what didn't happen, and what didn't happen is *any* of her

iterations of what did happen." (Emphasis added.) At one point, defense counsel referred to A as a "dangerous child," suggesting that A's allegations were calculated and manipulative. Defense counsel concluded his closing argument by stating to the jury that, either "*it all happened or none of it happened*," and that it was the defendant "versus the forensic interview . . . [a] forensic interview after the girl repudiates it, and isn't that a reasonable doubt. And isn't that really this case." (Emphasis added.) In addressing the evidence that supported the charge of sexual assault in the fourth degree in her closing remarks,[43] the prosecutor referred to A's general testimony about how the defendant would touch her breasts and buttocks both over and under her clothes, and how the defendant would have A touch his penis. The prosecutor did not refer to any specific instances of conduct during those remarks.[44]

---

[43] Specifically, the prosecutor, in discussing the element of sexual contact with respect to the charge of sexual assault in the fourth degree, stated: "What evidence do you see here or see to support this element of the charge? You heard testimony from [A]. You heard [A] testify before you. She explained that, starting in August of 2018, the defendant started touching her. He would touch her on her breasts and her buttocks, both over the clothes and under the clothes. You then heard testimony from [A] that, starting in the fall of 2018, [the defendant] would have her touch his penis, and that throughout their time together on Wednesdays and Thursdays, he would touch her breasts and he would touch her buttocks. And then, when they would lay together on the couch, he would have her touch his penis; that is all sexual contact. You reviewed the forensic interview where [A] similarly said that she would go there on Wednesdays and Thursdays and that he would—touch her breasts and her buttocks under the clothes and over the clothes and that he—starting in the fall, he would have her touch his penis. And that he would take his penis out and she would touch the skin. Again, that's all sexual . . . contact."

[44] Later in the prosecutor's initial closing remarks, she stated: "The judge is going to instruct you that you need to be unanimous as to the specific act of touching. So, touching of the breast or the buttocks or having . . . her touch his penis. There is evidence of all of these but it's, or, so if you're satisfied that a specific [act] of the defendant touching [A's] breasts occurred or a specific act of touching her buttocks occurred or a specific act of her touching his penis, and you believe all the other elements are met, then you . . . should and can find him guilty. So, here are examples of that, for example, how in the forensic interview when she talks about one of the

The present case is similar to *Velasquez-Mattos* in that the defendant's theory of defense was that A was lying and that he never had any sexual contact with A. This was borne out through defense counsel's many attacks on the credibility of A's allegations, either in closing remarks or through direct examination and cross-examination of witnesses, which exposed the fact that A had lied during her forensic interview; challenged the significance of the volume of text messages between A and the defendant, pointing out that in the thousands of messages there was no mention of the sexual contact between the two; suggested that, under the circumstances as alleged by A, she would not have delayed her disclosure of the abuse; and demonstrated that the defendant was not a contributor to the DNA profile generated from the sample of the leggings. Defense

last times she was there, so in February of 2019, he was being, in [A's] words, extra, extra creepy. Where he was making her touch his penis on the couch and grabbed her butt and breasts. Or, for example, how in her testimony here in court, she recalled the first time she went into his bedroom in August of 2018 and how she recalls him bringing her into his bedroom and, while in the bedroom, laying her on the bed, and he started touching her breasts over the clothes. Or how she testified on direct examination how, starting in October of 2018, when they started hanging out in the living room . . . they would cuddle and she testified his hands would be a lot of places, her thighs, her stomach, her vagina and her breasts and that her hands were on his penis."

With respect to these remarks, the defendant asserts that the prosecutor "appeared to conflate the various ways the offense could be committed (the different types of touching) with the various incidents on which a conviction could be based into a confusing reference to 'the specific act of touching.' " We do not agree that the jury could have been confused by the prosecutor's remarks about specific acts of touching by the defendant, which pertained to the means by which the defendant was alleged to have committed the sexual assault charge and were consistent with the unanimity instruction provided by the court. Although, in making these remarks, the prosecutor did refer to two of the three specific instances of sexual contact by the defendant, the remarks were made in the context of discussing the court's unanimity charge, not the elements establishing the sexual assault in the fourth degree charge, and the prosecutor merely highlighted the evidence demonstrating the various ways in which the defendant had sexual contact with A.

counsel never differentiated between A's general testimony and the three specific ways the state alleged that the defendant committed assault in the fourth degree. Consequently, the primary question before the jury was whether A should be believed, not whether any particular incident proved the defendant guilty of sexual assault in the fourth degree beyond a reasonable doubt. As our Supreme Court explained in *Velasquez-Mattos*, "the risk of prejudice to the defendant was minimized when . . . the defendant utilized the same theory of defense for both the single specific incident alleged and the general conduct alleged, namely, that the sexual abuse never happened and that it was entirely fabricated. Put differently, there was no realistic possibility of juror confusion or disagreement concerning the multiple incidents because the jurors were required either to find that the allegations were fabricated and that no sexual conduct ever occurred at all, or to believe J's testimony, as corroborated by the other witnesses, that anal penetration had in fact occurred on October 2, 2014." *State* v. *Velasquez-Mattos*, supra, 347 Conn. 856.

The present case, however, in which we have determined that the jury had before it testimony and other evidence regarding three separate instances of sexual conduct that could support the sexual assault charge in count one, differs from *Velasquez-Mattos*, in which the court ultimately concluded that the record in that case "demonstrate[d] that the state presented substantial evidence of one specific instance of sexual intercourse to serve as an exemplar of the ongoing sexual abuse that J had endured at the hands of the defendant," "the prosecutor specified during closing argument that the state was relying on the October 2, 2014 incident as the basis for [the] charge [of sexual assault in the first degree]," and the prosecutor's direct examination of witnesses "was consistent with that approach." Id. Those factors, along with the fact that the defendant

utilized the same theory of defense for the specific incidents and the general conduct—that the abuse never occurred and that J's testimony was entirely fabricated—provided the basis for the court's determination of no prejudice in that case. Id. The circumstances of the present case, therefore, fall somewhere between *Joseph V.* and *Velasquez-Mattos*, and present a much closer call on the issue of prejudice.

After taking into consideration the other factors noted by our Supreme Court, such as the defendant's theory of defense that no sexual contact occurred and that A's testimony should not be believed, as well as the facts that defense counsel never cross-examined A regarding the specific instances at issue with respect to count one and never differentiated between A's general testimony or her specific testimony as to the instances of sexual contact by the defendant, either during trial or in closing remarks, and, instead, ended his closing remarks by telling the jury that "it all happened or none of it happened," we do not agree with the defendant that the duplicitous nature of count one of the operative information created a potential for the jury "to disagree about which of the various alleged incidents the defendant committed." Like the defendant in *Velasquez-Mattos*, the defendant in the present case advanced a theory of defense simply denying A's allegations in their entirety. As our Supreme Court stated in *Velasquez-Mattos*, when a defendant advances a theory of defense that the sexual abuse was fabricated and never happened, there is "no realistic possibility of juror confusion or disagreement concerning the multiple incidents because the jurors were required either to find that the allegations were fabricated and that no sexual conduct occurred at all, or to believe [the victim's] testimony" that the sexual conduct did, in fact, occur.[45] *State* v.

---

[45] We reach this conclusion with due consideration for the well established principle that a jury may find credible all, some or none of a witness' testimony. See, e.g., *State* v. *Wright*, supra, 235 Conn. App. 153. We, however,

*Velasquez-Mattos*, supra, 347 Conn. 856; see also *State* v. *Hufford*, supra, 205 Conn. 397 (defendant was not prejudiced when he denied that incident had ever occurred and did not assert that he would have changed his defense had he been charged in separate counts with each alternative).[46] Likewise, in the present case

are bound by our Supreme Court's decision in *Velasquez-Mattos* concerning the impact that such an "all-or-nothing" defense can have on a determination of prejudice. See *State* v. *Velasquez-Mattos*, supra, 347 Conn. 856.

[46] Other state courts agree with this reasoning. See, e.g., *State* v. *Moyer*, 306 Kan. 342, 358–63, 410 P.3d 71 (2017) (any error in court's failure to instruct jury that it had to be unanimous as to specific act of fellatio that constituted criminal sodomy was harmless given that defendant asserted general denial to all of alleged sexual acts); *State* v. *Voyles*, 284 Kan. 239, 253, 160 P.3d 794 (2007) ("Kansas appellate courts have held a 'failure to instruct' in multiple acts cases to be reversible error except when the defendant presents a unified defense, e.g., a general denial. If there is no unified defense, we do not tolerate verdict uncertainty in these cases. Stated in the language of the clearly erroneous standard of review applicable when no unanimity instruction has been requested, cases not containing a unified defense are reversed because the reviewing court is firmly convinced that there is a real possibility the jury would have returned a different verdict if the instruction had been given."); *State* v. *Escobar*, 523 S.W.3d 545, 552–53 (Mo. App. 2017) (when defendant denied allegations of sexual abuse as whole, argued that victim fabricated story and presented no incident-specific evidence to contest either of two specifically described instances of abuse, no reversible error resulted from court's failure to provide jury with specific unanimity instruction as to instances of conduct, especially given that "members of jury had to decide whether they found [the victim's] testimony credible, and defendant's convictions show that they did so," in light of "the totality of the circumstances, the nature of [the victim's testimony, and [the defendant's] defense"); *State* v. *Payne*, 414 S.W.3d 52, 56–57 (Mo. App. 2013) (no manifest injustice resulted from trial court's failure to provide specific unanimity instruction as to instances of conduct when defendant's "defense consisted entirely of attacking [v]ictim's credibility and identifying numerous inconsistencies in his statements and testimony so as to prove that *all* of [v]ictim's allegations were fabricated" and "was simply a general denial and not incident specific," and when "defendant does not rely upon evidentiary inconsistencies and factual improbabilities respecting each specific allegation . . . it [is] unlikely that individual jurors convicted him based on different acts"; "[s]imply put, if the jury credited [the defendant's] defense, it would have found him not guilty . . . [but it] . . . apparently credited the [s]tate's evidence and found [the defendant] guilty" (emphasis in original; internal quotation marks omitted)), overruled on other grounds by *Hoeber* v. *State*, 488 S.W.3d 648 (Mo. 2016); *Jaimes* v. *State*, Docket No. 05-24-00380-

any risk of prejudice or likelihood that the jury could have disagreed or been confused about the multiple separate incidents was minimized by the defendant's theory of defense that sexual contact never occurred at all, which, in effect, required the jury either to believe A's testimony, which was corroborated in part by other testimony and documentary evidence, or to find that no sexual contact of the type alleged in count one occurred at all. In other words, the primary issue before the jury in this case was A's credibility. Even though the jury had before it testimony as to three instances of sexual contact, that alone cannot form the basis for a finding of prejudice, as it would be tantamount to a finding of structural error, and, in *Douglas C.*, our Supreme Court expressly rejected a claim that the failure to provide a specific unanimity instruction as to instances of conduct is structural error. See *State* v. *Douglas C.*, supra, 345 Conn. 447 n.16. That is further evidenced by the fact that, in *Joseph V.*, the court's finding of prejudice was based on not only the specific nature of the testimony concerning three to four discreet instances of sexual abuse, but on certain additional factors, such as "defense counsel's extensive

---

CR, 2025 WL 2456130, *7 (Tex. App. August 26, 2025) (defendant did not demonstrate egregious harm when he "presented an all-or-nothing defense that attacked [the victim's] credibility as to any and all alleged instances of abuse equally and, in reaching a guilty verdict, the jury necessarily disbelieved [the defendant's] defensive theories and found [the victim] credible equally as to all instances of abuse alleged") (review denied, November 20, 2025); *State* v. *Nelson*, 213 Vt. 368, 391–95, 246 A.3d 937 (2020) (because defendant asserted "all or nothing" theory of case that complainant's testimony was not credible, defendant did not distinguish any of specific allegations of sexual assault or deny them on individualized basis, it was not reasonably possible that "some members of the jury found the complainant credible as to certain instances of sexual assault while other members of the jury believed her credible as to different, exclusive instances"; as result, there was no reversible error resulting from court's failure to provide jury with specific unanimity instruction as to instances of conduct); *State* v. *Bellanger*, 206 Vt. 489, 502–503, 183 A.3d 550 (2018) (defendant did not demonstrate that lack of specific unanimity instruction gave rise to prejudice, especially given defendant's " 'all or nothing' " defense at trial).

cross-examination and closing argument directed at unique credibility concerns related to each incident, as well as the prosecutor's closing argument that any of the alleged incidents would establish the element of sexual intercourse." *State* v. *Joseph V.*, supra, 345 Conn. 556–57.

Accordingly, we are not convinced that "the duplicity created the genuine possibility that the [defendant's] conviction resulted from different jurors concluding that the defendant committed different acts"; *State* v. *Douglas C.*, supra, 345 Conn. 447; given the circumstances of this case, including the defendant's theory of defense, the focus of the trial and the closing remarks of counsel.[47] On the basis of the record in this case, we conclude, consistent with *Velasquez-Mattos*, that "the defendant was not prejudiced by the uncured violation of his right to jury unanimity as to instances of conduct . . . ." *State* v. *Velasquez-Mattos*, supra, 347 Conn. 857. Accordingly, no constitutional violation exists, and the defendant is not entitled to a new trial as to the charge of sexual assault in the fourth degree. See id.

The judgment is affirmed.

In this opinion SUAREZ, J., concurred.

---

[47] It is also noteworthy that this case involved a significant amount of general testimony from A concerning the ongoing sexual abuse that she endured, although, as we have indicated, this is not a case in which the jury was presented with general testimony only. See *State* v. *Douglas C.*, supra, 345 Conn. 461 (our Supreme Court left "open the possibility that 'there [may exist] a common-law exception to the right to jury unanimity for a continuing course of conduct of sexual assault of children when there is only general testimony' " and stated further that, "in sexual assault cases involving only general testimony, a duplicitous count that is not cured by a specific unanimity instruction likely will not be harmful").